FILED
United States Court of Appeals
Tenth Circuit

May 25, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DANNY KEITH HOOKS,

   Petitioner - Appellant,

  v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

   Respondent - Appellee.

No. 07-6152

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 02-CV-224-T)**

Randy A. Bauman, Assistant Federal Public Defender (James A. Drummond, Assistant Federal Public Defender, with him on the briefs), Oklahoma City, Oklahoma, for Petitioner - Appellant.

Robert L. Whittaker, Assistant Attorney General, Criminal Division (W.A. Drew Edmondson, Attorney General of Oklahoma, with him on the brief), Oklahoma City, Oklahoma, for Respondent - Appellee.

Before **LUCERO**, **MURPHY**, and **O'BRIEN**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

An Oklahoma jury convicted Danny Hooks on five counts of first degree murder and imposed five death sentences. The Oklahoma Court of Criminal Appeals ("OCCA") affirmed the convictions and death sentences, *Hooks v. State*, 19 P.3d 294, 319 (Okla. Crim. App. 2001), and denied post-conviction relief, *Hooks v. State*, 22 P.3d 231, 233 (Okla. Crim. App. 2001). Hooks then filed a 28 U.S.C. § 2254 habeas corpus petition, challenging his convictions and death sentences. The district court denied relief. Hooks appeals to this court, raising four claims: (1) trial counsel was ineffective during the guilt and penalty phases of trial; (2) prosecutorial misconduct denied him a fair sentencing proceeding; (3) an *Allen* charge[1] given during penalty-phase deliberations coerced the jury into returning death sentences; and (4) the cumulative impact of these errors denied him a fundamentally fair sentencing proceeding.[2]

Hooks has failed to demonstrate that the OCCA's resolution of his claim of ineffective assistance of trial counsel during the guilt phase is contrary to or an

---

[1]*Allen v. United States*, 164 U.S. 492 (1896). "An *Allen* charge is a supplemental instruction . . . designed to encourage a divided jury to agree on a verdict." *United States v. LaVallee*, 439 F.3d 670, 689 (10th Cir 2006) (quotation omitted). Because it can have the effect of "blasting verdicts out of juries," it is also known as the "dynamite charge." *United States v. Zabriskie*, 415 F.3d 1139, 1148 (10th Cir. 2005) (quotation omitted).

[2]Because the district court granted Hooks a certificate of appealability as to each issue raised on appeal, this court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984).

28 U.S.C. § 2254(d)(1). Furthermore, the record makes clear that all aspects of

this claim raised for the first time in Hooks's habeas petition fail on the merits.

*Id.* § 2254(b)(2). Accordingly, this court **affirms** the denial of habeas relief on

the murder convictions. Nevertheless, the *Allen* charge given by the trial court in

the midst of penalty-phase deliberations, when considered in the context of all

surrounding circumstances, coerced the jury into returning death sentences.

Furthermore, the OCCA's decision to the contrary is an unreasonable application

of *Lowenfield v. Phelps*, 484 U.S. 231 (1988). 28 U.S.C. § 2254(d)(1).

Accordingly, this court **reverses** and **remands** to the district court to grant habeas

relief to Hooks on each of his five death sentences.[3]

## II. BACKGROUND

The relevant underlying historical facts were outlined by the OCCA in its

opinion on direct appeal:

> On May 16, 1992, the bodies of Phyllis Adams, LaShawn
> Evans, Sandra Thompson, Carolyn Watson, and Francill Roberts
> were found in a small bedroom in a crack house. Each woman was
> gagged and had been stabbed several times. The bodies were nude
> and Thompson, Watson, and Roberts were bound. [Adams was
> partially clothed but her brassiere and shirt were pulled up, exposing
> her chest area. Evans and Adams were not bound, but evidence
> suggested at one time Adams's hands had been tied.] The room was

---

[3]Because he is entitled to habeas relief on this ground, we do not reach any
of Hooks's additional challenges to his death sentences.

in disarray and the victims' purses appeared to have been searched. There were no drugs or money in the house.

Although there were five victims in a confined space, the evidence suggested one person committed the crimes. The women were killed in the bedroom. A trail of blood drops led to the front door, and Luminol testing showed a single set of bloody footprints also leading from the bedroom to the front door. There was a great deal of the victims' blood in the bedroom. However, the blood trail to the door, and some other blood drops found at various places in the bedroom, did not come from any of the victims. A bloody palm print was on the west wall of the bedroom closet, and police found a bloody boot print with "Honchos" embossed on the sole. Despite a thorough investigation police found nobody who matched either the palm print or the blood drops. In 1995 samples of the blood drops were submitted for DNA testing, and those results were distributed nationally in 1996. In 1997, California penal authorities informed the Oklahoma State Bureau of Investigation (OSBI) that they had a person with that DNA profile. Subsequent tests confirmed that the blood trail, drops in the bedroom, and bloody palm print all belonged to Hooks. DNA from semen found in Roberts's mouth was also consistent with Hooks' DNA.

Hooks admitted he was at the house. He testified he went there during the evening of May 15th, and sometime close to or shortly after midnight on May 16th he was there smoking crack cocaine with all the victims. Hooks said he only knew the woman who rented the house, and could not remember any of the victims' names. He said he had "regular" sex with one woman and oral sex with another. During the night they ran out of crack and Hooks gave two of the women $30 to go buy more. After they returned and finished smoking, he ran out of drugs and money and left. Hooks said he got home—about a mile from the house—around 2:00 a.m. He decided to go back sometime after 4:00 a.m. On the way, he cut his left index finger falling off his bicycle while trying to fix the kick stand. When he got there the house was dark and the door was ajar. He pushed it open and entered cautiously, closing the door behind him, went to the bedroom and saw the bodies, and went back to the front door. He lifted the curtain and looked outside, then decided to go back in and check on the victims in case anyone was alive. He returned to the bedroom and determined each victim was dead. After he checked Evans's body he picked up a shirt and wrapped it around his cut finger. Hooks looked at the contents of the victims' purses on

the west bed, then knelt and looked under the clothes in the closet.
He then left the house, dropping the shirt by the front door, and
closed the door. Hooks did not tell anyone what he had seen because
he was afraid the authorities would revoke his California parole for
being in a crack house. Two weeks later he left the area. In
November he was arrested in Holdenville, Oklahoma, on a domestic
complaint and returned to California.

*Hooks*, 19 P.3d at 303-04 & n.2. Additional historical or procedural facts

necessary to the resolution of this appeal are set out more fully below.

## III. AEDPA STANDARD

This court's review is governed by the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA"). *Snow v. Sirmons*, 474 F.3d 693, 696 (10th Cir.

2007). With certain exceptions noted below, each claim Hooks raises on appeal

was resolved on the merits by the OCCA. Accordingly, this court may not grant

habeas relief on any such claim unless the decision of the OCCA "was contrary

to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

> Under the "contrary to" clause, we grant relief only if the state court
> arrives at a conclusion opposite to that reached by the Supreme Court
> on a question of law or if the state court decides a case differently
> than the Court has on a set of materially indistinguishable facts.
> Under the "unreasonable application" clause, relief is provided only
> if the state court identifies the correct governing legal principle from
> the Supreme Court's decisions but unreasonably applies that
> principle to the facts of the prisoner's case.

*Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (quotations, alterations, and footnote omitted). As these standards make clear, "[w]hen reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly." *McLuckie v. Abbott*, 337 F.3d 1193, 1197 (10th Cir. 2003). "Rather, we must be convinced that the application was also objectively unreasonable." *Id.*

> Th[e] question is not wh[at] the trial judge should have [done.] It is not even whether it was an abuse of discretion for her to have done so—the applicable standard on direct review. The question under AEDPA is instead whether the determination of the [State] Supreme Court . . . was "an unreasonable application of . . . clearly established Federal law." [28 U.S.C. §] 2254(d)(1). We have explained that "an unreasonable application of federal law is different from an incorrect application of federal law." Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Rather, that application must be "objectively unreasonable." This distinction creates "a substantially higher threshold" for obtaining relief than de novo review. AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," and "demands that state-court decisions be given the benefit of the doubt."

*Renico v. Lett*, No. 09-338, 2010 WL 1740525, at *5 (May 3, 2010) (citations omitted).

It is important to note, however, that "[t]his standard does not require . . . abject deference, but nonetheless prohibits us from substituting our own judgment

for that of the state court." *Snow*, 474 F.3d at 696 (quotations and footnote

omitted). As the Supreme Court has made clear,

> Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court's . . . determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Miller-El v. Dretke*, 545

U.S. 231, 240 (2005) (holding the AEDPA "standard is demanding but not

insatiable").

## IV. GUILT-PHASE INEFFECTIVE ASSISTANCE OF COUNSEL

*A. Background*

On direct appeal, Hooks alleged his trial counsel was ineffective. As a

general matter, his claim revolved around the contention counsel was unprepared

for trial and, therefore, failed to present an adequate defense to the murder

charges. Hooks briefed the following specific claims of ineffective assistance

before the OCCA: (1) trial counsel's closing was insufficient in that it failed to

marshal the evidence supporting Hooks's version of events on the night of the

murders; (2) trial counsel failed to timely request from Hooks's family the work

boots he customarily wore at the time of the crime, thereby precluding their use at

trial to oppose the theory Hooks left the bloody "Honcho" boot prints at the crime

-7-

scene; (3) trial counsel failed to object to egregious instances of prosecutorial misconduct; and (4) trial counsel failed to move *in limine* to exclude Hooks's prior convictions for rape and assault and was, therefore, forced to elicit that evidence himself at the beginning of Hooks's testimony in an effort to remove its sting if introduced by the prosecution during cross-examination.[4] After setting out the *Strickland* standard and noting trial counsel was less than a "zealous advocate," the OCCA rejected on the merits each discrete claim of ineffective assistance of counsel set out in Hooks's direct-appeal brief. *Hooks*, 19 P.3d at 317-18.

Hooks reasserted in his federal habeas petition that trial counsel was constitutionally ineffective. Unfortunately, his petition is far from a model of specificity. Instead, it begins with a generalized assertion that trial counsel's lack of investigation and preparation prevented the presentation of a viable defense theory during the guilt phase of the trial. It then sets out a summary listing of trial counsel's failures in this regard: (1) failure to contact prosecution witnesses in advance of trial; (2) failure to engage in meaningful pre-trial motions practice;

---

[4]Hooks also sought an evidentiary hearing to develop the factual bases of additional claims of ineffective assistance of trial counsel appearing outside the record on direct appeal. Okla. Stat. tit. 22, ch. 18, App. Rule 3.11(B)(3)(b). He sought to develop claims his counsel failed to (1) investigate and present evidence from police reports; (2) obtain his boots prior to trial; and (3) provide evidence in support of a challenge to the racial composition of the jury venire. The OCCA summarily rejected Hooks's request for an evidentiary hearing. *Hooks v. State*, 19 P.3d 294, 317 n.65 (Okla. Crim. App. 2001).

(3) failure to timely obtain Hooks's work boots; (4) deferring opening statement until the beginning of the defense's case and then making an inadequate opening statement; and (5) failure to present the jury with a viable theory of the case during closing argument.  Hooks also sought an evidentiary hearing to develop his claim of ineffective assistance.[5]

The district court denied habeas relief on this claim.  It began by discrediting, as inconsistent with the record, the contention that trial counsel had undertaken so little investigation and preparation that he was forced to proceed to trial with no strategy for dealing with the prosecution's case.  The district court moved on to note that many of the examples of ineffective assistance identified by Hooks had been resolved on the merits by the OCCA consistent with the standards set out in *Strickland*.  The district court rejected on the merits the

[5]More than two years after filing his petition, Hooks sought permission to amend it to add additional claims.  According to the motion, "recently developed facts [call into question] the strength of the blood evidence offered by the State . . . and the ineffectiveness of . . . trial counsel for his failure to effectively challenge that evidence."  Oklahoma asserted the district court should deny the motion because the new claims were unexhausted and, thus, subject to an anticipatory procedural bar.  *See Cummings v. Sirmons*, 506 F.3d 1211, 1222-23 (10th Cir. 2007).  The district court granted Hooks's motion to amend without addressing Oklahoma's arguments.  In its substantive response to the amended petition, Oklahoma contended Hooks's newly asserted claim of ineffective assistance was time barred under § 2244(d) because it did not arise out of the same common core of operative facts as the claims set out in Hooks's original § 2254 petition.  *See Mayle v. Felix*, 545 U.S. 644, 664 (2005).  As set out below, the district court denied the ineffective assistance claim in Hooks's amended § 2254 habeas petition on the merits, without resolving the statute of limitations or procedural bar defenses advanced by Oklahoma.  *Cf.* 28 U.S.C. § 2254(b)(2) (providing an unexhausted habeas claim can be denied on the merits).

ineffective assistance claim set out in the amended § 2254 petition, concluding

the serology evidence relied on by Hooks did not negate his guilt and did not alter

> the fact that trial counsel was faced with the necessity of explaining why [Hooks] was in the house and how his blood was found at the scene. Even had counsel presented testimony consistent with Dr. Allen's opinions, he would still have been faced with the almost certain necessity of [Hooks] testifying in order to offer an explanation to the jury for the existence of this and other evidence. [Hooks's] defense rested on the believability of his versions of the events and his credibility with the jury.

Finally, the district court denied Hooks's request for an evidentiary hearing,

noting that in analyzing the claim of ineffective assistance, it had considered all

additional evidence Hooks adduced during the federal habeas proceedings. Even

considering that additional evidence, the district court concluded the record

conclusively established Hooks was not entitled to habeas relief.

## B. Analysis

On appeal to this court, Hooks raises the following claims of guilt-phase

ineffective assistance of trial counsel: (1) failure to investigate; (2) failure to

perform pre-trial motions practice; (3) failure to timely offer his work boots; (4)

failure to offer forensic evidence; (5) and deferral of opening statement.[6] Hooks

---

[6]In the section of his brief relating to guilt-phase ineffective assistance, Hooks summarily asserts trial counsel failed to object to improper prosecutorial comments. Rather than identifying the comments at issue, Hooks directs this court to the grounds for relief in Proposition I of his appellate brief. Each of the prosecutorial comments identified in Proposition I, however, relates to the penalty phase. Accordingly, this court does not consider this contention in resolving Hooks's claims of ineffective assistance during the guilt phase of trial.

further claims the district court erred when it denied his request for an evidentiary hearing.

To prevail on a claim of ineffective assistance, Hooks must show his counsel's performance "fell below an objective standard of reasonableness" and "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687-88. Review of counsel's performance under *Strickland*'s first prong is highly deferential: "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. To be deficient, the performance must be "outside the wide range of professionally competent assistance." *Id.* In other words, "it must have been completely unreasonable, not merely wrong." *Boyd v. Ward*, 179 F.3d 904, 914 (10th Cir. 1999); *see also Strickland*, 466 U.S. at 687 (holding that to demonstrate deficient performance, a petitioner must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [a] defendant by the Sixth Amendment").

As for *Strickland*'s prejudice prong, Hooks must establish that but for counsel's errors, there is a reasonable probability "the result of the proceeding would have been different." 466 U.S. at 694. That is, Hooks must show "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.* at 687. Establishing a reasonable probability of a different outcome requires something less than a showing "counsel's deficient conduct

-11-

more likely than not altered the outcome in the case." *Id.* at 693. Instead, a reasonable probability is one "sufficient to undermine confidence in the outcome." *Id.* at 694.

If Hooks is unable to show either "deficient performance" or "sufficient prejudice," his claim of ineffective assistance necessarily fails. *Id.* at 700. Thus, it is not always necessary to address both *Strickland* prongs. In particular, if Hooks is unable to satisfy his burden under *Strickland*'s prejudice prong, it is unnecessary to determine whether counsel's performance was deficient. *Id.* at 697. In undertaking a *Strickland* analysis of Hooks's claims, this court keeps the AEDPA standards of review firmly in mind. *See supra* Section III. (setting out AEDPA standards); *Wiggins v. Smith*, 539 U.S. 510, 520-23 (2003) (undertaking *Strickland* analysis against backdrop of AEDPA standards).

*1. Failure to Investigate and Prepare*

Hooks begins his briefing with a generalized assertion counsel failed to adequately investigate and prepare for trial. Hooks asserts counsel's conduct "verges" on the absence of representation identified as grounds for relief in *United States v. Cronic*, 466 U.S. 648, 659 (1984). A review of his brief on direct appeal demonstrates Hooks did not raise a *Cronic* claim before the OCCA. It is likewise unclear whether Hooks raised a *Cronic* claim before the district court. Nevertheless, because it is abundantly clear Hooks is not, as a matter of law, entitled to relief under *Cronic*, we resolve this claim on the merits. 28 U.S.C.

-12-

§ 2254(b)(2) (providing federal habeas court can deny unexhausted claims on the merits).

In *Cronic*, the Supreme Court identified three situations when *Strickland* does not apply but the Court will, instead, presume prejudice without inquiring into counsel's performance. 466 U.S. at 658-59. Hooks invokes the second situation identified in *Cronic*: a presumption of prejudice is warranted if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id.* at 659. The Court has made clear, however, that this exception to *Strickland* will apply only in the narrowest and rarest of circumstances: "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete." *Bell v. Cone*, 535 U.S. 685, 696-97 (2002). Consistent with this statement, the Court has indicated an alleged failure to adduce evidence and a decision to waive closing argument must be analyzed under *Strickland*, rather than under the rubric set out in *Cronic*. *Bell*, 535 U.S. at 697; *see also Patrasso v. Nelson*, 121 F.3d 297, 302 (7th Cir. 1997) (rejecting argument *Cronic* should apply because of "the magnitude of [counsel's] multiple failures," and holding instead that "where ineffectiveness is due to the attorney's lack of preparation or skill . . . *Strickland* rather than *Cronic* applies").

Because the record in this case demonstrates trial counsel did not "fail[] to oppose the prosecution throughout the [trial] as a whole," *Cronic* does not apply.

-13-

*Bell*, 535 U.S. at 697; *see also Hooks*, 19 P.3d at 317-18 (noting trial counsel used the evidence presented at trial to argue the prosecution had not proven Hooks guilty of murder); *infra* Section IV.A.2.e. (discussing lack of prejudice flowing from trial counsel's deficient opening statement). Accordingly, this court moves on to consider whether the specific acts or omissions identified by Hooks entitle him to relief under the standard set out in *Strickland*. *See Strickland*, 466 U.S. at 690 ("A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."); *Cronic*, 466 U.S. at 666 (holding that absent evidence "counsel failed to function in any meaningful sense as the Government's adversary," a petitioner can "make out a claim of ineffective assistance only by pointing to specific errors made by trial counsel").

### 2. *Pre-Trial Motion Practice*

Hooks begins with a generalized assertion his trial counsel failed to engage in meaningful pre-trial motions practice. He then summarily identifies the following specific deficiencies: trial counsel failed to (1) file motions challenging the validity of the aggravating circumstances set out by the prosecution in support of the death penalty; and (2) file a motion *in limine* to exclude sexual proclivity evidence and evidence of Hooks's prior criminal record.

As to the claim trial counsel was ineffective for failing to challenge the validity of the aggravating circumstances set out in the prosecution's bill of

particulars, we simply note this alleged failure does not relate in any way to the guilt phase of trial. Because, as set out more fully below, this court grants Hooks habeas relief as to his death penalties on the basis of the trial court's *Allen* instruction, *see infra* Section V., we need not further consider this particular allegation of ineffective assistance.

As to the assertion trial counsel should have moved *in limine* to exclude evidence of his prior rape and assault convictions, we note the OCCA resolved this exact claim on the merits under the standards set out in *Strickland*. *Hooks*, 19 P.3d at 318. The OCCA concluded trial counsel was not ineffective for failing to seek to exclude the prior convictions because those convictions were admissible at trial for impeachment purposes pursuant to Okla. Stat. tit. 12, § 2609(A)(1). *Hooks*, 19 P.3d at 318.[7] Because Hooks does not even address the merits of the

[7]The OCCA's analysis is as follows:

When Hooks took the stand counsel made sure the jury knew Hooks had prior convictions for rape and assault with intent to commit bodily harm. Hooks now complains this trial strategy was unreasonable. He suggests counsel should first have moved the trial court to rule these prior convictions unavailable for impeachment purposes. Prior convictions may be used to impeach a witness. In ruling on their admissibility the court must consider (1) their impeachment value; (2) the time of the convictions and the defendant's subsequent history; (3) the similarity between the prior and charged crimes; (4) the importance of the defendant's testimony; and (5) whether credibility is central to the trial. We disagree with Hooks's claim that the prior offenses were so similar to the charged crime of murder as to automatically prejudice the jury against him. Hooks's prior convictions were relevant for impeachment purposes and admissible, and their probative value for impeachment was not

(continued...)

OCCA's decision, he has failed to demonstrate the OCCA's resolution of this claim is an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d)(1). In any event, because Hooks's prior convictions were admissible as a matter of Oklahoma law, trial counsel did not perform deficiently when he raised the matter during direct examination in an effort to remove the sting of the evidence before the prosecution could develop it during cross-examination. Thus, Hooks is not entitled to habeas relief on this ground.

Hooks also asserts counsel was ineffective for failing to move *in limine* to exclude "sexual proclivity evidence" independent of the evidence relating to his past convictions. He does not, however, describe the evidence at issue, indicate on what basis it could have been excluded, or brief how it impacted his trial. Because the matter is only mentioned in passing and not briefed "with citations to the authorities and parts of the record on which [Hooks] relies," Fed. R. App. P. 28(a)(9)(A), the issue is forfeited. *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) (citing Rule 28(a)(9)(A) for the proposition this court has "routinely . . . declined to consider arguments that are  . . .  inadequately presented[] in an appellant's opening brief").

---

[7](...continued)
outweighed by the danger of prejudice. As the prior convictions were admissible and would have been used for impeachment, counsel was not ineffective for omitting to ask the trial court to prohibit the State from using Hooks's priors.
*Hooks*, 19 P.3d at 318 (footnotes omitted).

-16-

### 3. Failure to Produce Work Boots

At trial, the prosecution presented evidence indicating someone wearing "Honchos" work boots walked through blood at the crime scene, possibly while the victims were being killed. It further adduced evidence that during the period in question, Hooks normally wore work boots similar to the "Honchos" that left the print at the scene of the crime. In response to the prosecution's focus on the "Honchos" boot print, trial counsel asked Hooks's family to find his work boots.[8] Although a family member found the boots and brought them to the courthouse, the trial court excluded the evidence as a discovery sanction for not giving the boots to the prosecution during pre-trial discovery. On direct appeal, Hooks alleged (1) the trial court's exclusion of the boots as a discovery sanction violated the Due Process Clause; and (2) trial counsel's failure to obtain the boots and make them available during pre-trial discovery, thereby leading to their exclusion, amounted to ineffective assistance of counsel. *Hooks*, 19 P.3d at 306-07, 318.

The OCCA resolved these claims on the merits. As to the due process claim, the OCCA concluded the trial court erred in excluding Hooks's boots as a discovery sanction. *Id.* at 306-07. It concluded, however, the error was harmless beyond a reasonable doubt because the prosecution connected Hooks to the crime

---

[8]During the prosecution's cross-examination of Hooks, "Hooks admitted owning two pairs of boots in 1992—a pair of Army boots and lace-up work boots." *Hooks*, 19 P.3d at 306. Hooks denied owning "Honchos" boots and testified he left his work boots with his family when he left Oklahoma several months after the murders. *Id.*

through DNA and palm print evidence. *Id.* at 307. For that very same reason, the OCCA determined Hooks was not entitled to relief on his claim of ineffective assistance because he could not satisfy *Strickland*'s prejudice prong. *Id.* at 318; *cf. Strickland*, 466 U.S. at 694 (holding that to satisfy the prejudice prong, a petitioner must establish that but for counsel's errors, there is a reasonable probability the result of the proceeding would have been different).

On appeal to this court, Hooks asserts the admission of his work boots would have cast doubt on the prosecution's contention one person committed the crime and would have lent credence to his assertion he arrived at the scene after the murders had already taken place. He further asserts the decision of the OCCA is unreasonable because it fails to adequately recognize the power of this rebuttal evidence. In response, Oklahoma merely quotes the opinion of the OCCA on direct appeal and asserts that decision is not an unreasonable application of *Strickland*.

The decision of the OCCA—that there is no reasonable probability the outcome of the guilt phase of Hooks's trial would have been different if the boots had been admitted—is not unreasonable. *See McLuckie*, 337 F.3d at 1197 (holding this court can issue habeas writ only if state court's application of Supreme Court precedent is objectively unreasonable). As recognized by the OCCA, the boot print was the least compelling evidence tying Hooks to the crime scene. *Hooks*, 19 P.3d at 307. In particular, the prosecution adduced evidence of

a bloody palm print and a DNA match to blood at the crime scene. *Id.*
Furthermore, Hooks did not contest his presence at the crime scene, but instead testified he was only present before and after the murders. *Id.* at 305-06.

This court's review of the record demonstrates the prosecution's boot print evidence was not nearly as significant as Hooks suggests. The "Honchos" boots admitted at trial were purchased by police at the time of the crime and were simply a demonstrative exhibit. *Id.* at 306. Although the prosecution asked the jury to infer the "Honchos" boot print came from Hooks because Hooks regularly wore work boots at the time of the crime, it does not appear the prosecution presented any evidence Hooks actually owned a pair of "Honchos" work boots. *See id.* Furthermore, trial counsel was successful during cross-examination in casting serious doubt on the value of the prosecution's boot print evidence.[9] The prosecution did not even mention the boot prints until the rebuttal portion of its closing argument. Instead, it was defense counsel who first raised the matter in closing, pointing out all of the problems earlier identified with the prosecution's assertion the "Honchos" boot prints belonged to the killer(s), let alone to Hooks.

---

[9]For instance, trial counsel adduced testimony to the following effect: (1) contrary to procedure, an officer was present at the crime scene in work boots without wearing protective booties; (2) officers never compared the size of the "Honchos" boot print to Hooks's shoe size to see if they matched; and (3) at least one of the individuals who discovered the bodies of the victims most likely entered the room where the victims were found and nobody checked the shoe prints of those individuals.

-19-

In light of the record, the OCCA reasonably determined Hooks was not prejudiced by trial counsel's failure to timely offer Hooks's work boots. *Strickland*, 466 U.S. at 694. Accordingly, Hooks is not entitled to habeas relief on this ground. 28 U.S.C. § 2254(d).

### 4. Failure to Adduce Forensic Evidence

Hooks asserts the district court erred in denying habeas relief on his claim trial counsel was ineffective in failing to present forensic evidence discrediting serology evidence presented by the prosecution. The district court bypassed potential procedural impediments to Hooks raising this claim (i.e., anticipatory procedural bar and § 2244(d)'s limitations period) and resolved this claim on the merits pursuant to § 2254(b)(2). It concluded Hooks had not suffered any prejudice from trial counsel's failure to offer evidence like that set out in the Amended Petition because such evidence (1) did not negate guilt and (2) would not have altered the need for Hooks to explain to the jury how his blood came to be in the house where the murders occurred. Because it decided this matter in the first instance, unconstrained by the standard of review set out in the AEDPA, this court reviews the district court's determination de novo. *Young v. Sirmons*, 551 F.3d 942, 970 (10th Cir. 2008).

In asserting trial counsel was ineffective in failing to develop evidence challenging the prosecution's serology evidence, Hooks relies on the affidavit of Dr. Robert Allen. Hooks argues Dr. Allen's testimony substantiates his version

-20-

of events and the absence of such evidence left his version of events entirely uncorroborated. This argument is based on a complete misreading of Dr. Allen's affidavit. Hooks asserts Dr. Allen's opinion supports the conclusion "that the blood evidence at the crime scene indicated more than one perpetrator." Brief of Petitioner at 61. A close review of Dr. Allen's affidavit, however, demonstrates it supports no such conclusion. Instead, the limited focus of Dr. Allen's affidavit is as follows: the serology testing undertaken by forensic chemist Melissa Keith could not and did not exclude the possibility of other perpetrators. In reaching this conclusion, Dr. Allen relied on the following: (1) two potential suspects had blood profiles so similar to Hooks's blood profile that they could not be excluded from the list of potential perpetrators without DNA analysis; and (2) up to thirty potential suspects had blood profiles similar to the five victims and Keith never undertook tests to analyze any blood evidence consistent with the blood profiles of the victims. Thus, testimony similar to Dr. Allen's, if introduced at trial, would have demonstrated nothing more than the abstract possibility an unknown person left blood at the scene of the crimes.

Placed in its proper context, even assuming its truth, Hooks has failed to demonstrate a "reasonable probability of a different outcome" if trial counsel had adduced testimony at trial similar to that set out in Dr. Allen's affidavit. *Strickland*, 466 U.S. at 694. In reaching this conclusion, we have nothing to add to the district court's cogent analysis:

-21-

Absent from Dr. Allen's affidavit are any opinions contradicting [Hooks's] DNA match with the "foreign blood" left at the scene. [Hooks's] argument speculates that there were more than one perpetrators and that another perpetrator might have been a source for semen found in one of the victims and, had that perpetrator or another perpetrator bled at the scene, might possibly have been a source of blood serologically similar to one of the victims. Trial counsel was faced not with speculation, but with evidence of [Hooks's] blood in the room with the victims' bodies and also a blood trail through the house. [Hooks's] palm print in blood was left at the closet. [The] Amended Petition and the accompanying affidavits do nothing to exonerate [Hooks] or negate the fact that trial counsel was faced with the necessity of explaining why [Hooks] was in the house and how his blood was found at the scene. Even had counsel presented testimony consistent with Dr. Allen's opinions, he would still have been faced with the almost certain necessity of [Hooks] testifying in order to offer an explanation to the jury for the existence of this and other evidence. [The] defense rested on the believability of his versions of the events and his credibility with the jury. As determined by the OCCA, trial counsel utilized the State's evidence and [Hooks's] testimony to argue the State had not proven [Hooks] was guilty.

*5. Opening Statement*

Hooks contends trial counsel provided ineffective assistance when he reserved his opening statement until the beginning of the defense's case and then gave a "woefully brief and substance-lacking opening statement." The record conclusively demonstrates Hooks suffered no prejudice as a result of this asserted instance of ineffective assistance. Thus, without regard to the question whether trial counsel's opening statement was so deficient as to satisfy *Strickland*'s

-22-

performance prong, Hooks is not entitled to habeas relief on this claim. 466 U.S.

at 697.[10]

In Oklahoma, the opening statement has a narrow purpose: "to inform the

jury of the evidence the attorneys expect to present during the trial." *Young v.*

*State*, 12 P.3d 20, 36 (Okla. Crim. App. 2000); *Hammon v. State*, 898 P.2d 1287,

1306 (Okla. Crim. App. 1995). An attorney is not allowed to argue the merits of

the case during opening statements. *Newsted v. State*, 720 P.2d 734, 738 (Okla.

Crim. App. 1986); *see also Malicoat v. State*, 992 P.2d 383, 394-95 & n.10 (Okla.

Crim. App. 2000) (discussing difference in purposes of opening statement and

---

[10]This claim is suspended in a procedural morass. It was first raised in Hooks's § 2254 petition. Oklahoma responded that the claim was unexhausted. Although it noted Hooks identified the opening statement as indicative of trial counsel's general failure to adequately prepare for trial, the district court did not otherwise analyze the merits of the claim or address whether it was exhausted. The district court's approach is understandable. As set out above, Hooks's habeas filings embrace a flawed interpretation of *Cronic*. He assumes he is entitled to relief if he can demonstrate his counsel's preparation for trial was inadequate and he can carry that burden by cursorily identifying "examples" of deficient conduct flowing from that inadequate preparation. As previously demonstrated, however, *Cronic* is not implicated by the facts of this case and Hooks can prevail only by identifying specific errors on the part of counsel amounting to deficient performance and by demonstrating he was prejudiced by those specific errors. In light of Hooks's approach, it is hardly surprising the district court thought it unnecessary to individually analyze each of the numerous cursorily stated "examples" of inadequate preparation set out in Hooks's habeas petition.

Before this court, Hooks again raises the issue, this time in a discrete section of his brief. Inexplicably, Oklahoma does not mention this aspect of Hooks's claim in its response brief. We choose not to enter this procedural swamp and, instead, exercise our discretion to bypass complex issues of exhaustion to reject the claim on the merits. *Revilla v. Gibson*, 283 F.3d 1203, 1211 (10th Cir. 2002). This is an especially appropriate course, as this claim "may be disposed of in straightforward fashion on substantive grounds." *Id.*

closing argument). Thus, in analyzing whether Hooks was prejudiced by counsel's delayed and allegedly inadequate opening statement, this court focuses on whether the jury was able to follow Hooks's theory of the case absent the opening statement. *Cf. Malicoat*, 992 P.2d at 394-95 (concluding nothing in the record indicated the "jurors were unable to understand or grasp the import of counsel's cross-examination of State witnesses" in the absence of an opening statement by defense counsel at the beginning of trial).

Upon review of the trial transcript, this court is firmly convinced the jury's understanding of, and ability to follow, the defense's case was not hampered by trial counsel's purportedly inadequate opening statement. The prosecution's case, as outlined in its opening statement, was centered mostly around (1) forensic evidence tying Hooks to the murders, and (2) testimony of Sheila McClain, Hooks's "main girlfriend," that Hooks was not at his house during the early morning hours when the murders occurred. As is clear from trial counsel's cross-examination of prosecution witnesses, the defense theory was that McClain's testimony was not credible[11]; there were serious problems with the prosecution's

_____

[11]For instance, in his cross-examination of Rose Mary Glaze, trial counsel cast doubt on McClain's testimony she had spent the morning of the murders waiting at Hooks's trailer to see if he would show up. In particular, Glaze testified it was unlikely anyone would approach Hooks's trailer unless Hooks was there to restrain his dog. During his cross-examination of Kevin Lonnie, trial counsel refuted McClain's assertion she never again saw Hooks after the murders and discredited the prosecution's assertion that Hooks abandoned his job after the murders. Furthermore, trial counsel elicited testimony from McClain that she

(continued...)

-24-

forensic evidence[12]; and the prosecution's theory that Hooks had, by himself, killed all five victims in a short time frame was unworthy of belief.[13] During his brief opening statement at the beginning of the defense's case, trial counsel indicated Hooks would take the stand and relate to the jury what actually happened on the morning of the murders.

Having reviewed the entire record, it is apparent the case was not factually or conceptually difficult, turning narrowly on the credibility of McClain's testimony and upon the persuasiveness of the state's forensic evidence. That Hooks's defense would contest those issues was clear from trial counsel's cross-examination of prosecution witnesses. There is simply nothing in the record

_____

[11](...continued)
smoked cocaine and consumed alcohol during the relevant time period, left Hooks's trailer during the relevant time period to drink with Lorenzo Brown, and had a poor memory of the night and morning in question.

[12]Using State's Exhibit 81, a picture of the crime scene, trial counsel was able to impeach Officer Kent Harrville, by demonstrating that contrary to Harrville's testimony not all officers used protective booties while present at the crime scene. Trial counsel further developed this evidence during cross-examination of Mike Burke, a homicide detective, when it was revealed he was the investigator pictured in Exhibit 81 without protective booties. Trial counsel also demonstrated investigators had not requested blood samples from all suspects to compare with the blood found at the murder scene. In addition, trial counsel cross-examined Mary Long, a criminalist with the Oklahoma State Bureau of Investigation, about the investigators' failure to conduct DNA tests on sperm found in some of the victims.

[13]Trial counsel offered evidence during cross-examination of Dr. Larry Balding that there were no substantial gaps in time between the deaths of the five victims.

supporting Hooks's assertion that the lack of an adequate opening statement

hindered the jury's ability to follow or understand the defense case. *Cf. Malicoat*,

992 P.2d at 394-95. Accordingly, Hooks has failed to demonstrate any prejudice

flowing from trial counsel's allegedly deficient opening statement and is not

entitled to relief under *Strickland*.

### 6. *Evidentiary Hearing*

Hooks asserts the district court erred in denying his request for an

evidentiary hearing. In so asserting, he broadly contends such a hearing would

establish trial counsel "failed to provide any reasonable advice or assistance"

during the entire course of the proceedings following the pre-trial hearing and

would include testimony from trial counsel and family members "who have

personal knowledge of [trial counsel's] unconscionable conduct."[14] In denying

---

[14]Hooks's filings make clear he desired an evidentiary hearing as an avenue
for discovery. "The purpose of an evidentiary hearing," however, "is to resolve
conflicting evidence." *Anderson v. Attorney General*, 425 F.3d 853, 860 (10th
Cir. 2005). The Rules Governing Section 2254 Cases in the United States District
Court [hereinafter "§ 2254 Rules"] provide mechanisms for discovery and
expansion of the record without the necessity of an evidentiary hearing. Rule 6, §
2254 Rules (providing district courts may authorize discovery); Rule 7, § 2254
Rules (providing district courts have discretion to expand the record with letters,
documents, exhibits, answers to interrogatories, and affidavits). These rules
allow the disposition of some petitions without the expenditure of resources
necessitated by an evidentiary hearing. Advisory Committee Notes to Rule 6,
§ 2254 Rules ("[P]re-hearing discovery may show an evidentiary hearing to be
unnecessary, as when there are no disputed issues of law or fact" (quotation
omitted)); Advisory Committee Notes to Rule 7, § 2254 Rules ("The purpose [of
this rule] is to enable the judge to dispose of some habeas petitions . . . without
the time and expense required for an evidentiary hearing.") Thus, where the
(continued...)

Hooks's request for an evidentiary hearing, the district court concluded that even assuming the truth of Hooks's factual assertions, he was not entitled to habeas relief. *See Miller v. Champion*, 161 F.3d 1249, 1253 (10th Cir. 1998) (holding that under pre-AEDPA law a habeas petitioner is entitled to an evidentiary hearing "so long as his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief").[15]

"A district court's decision to grant or deny an evidentiary hearing in a habeas proceeding is reviewed for an abuse of discretion." *Anderson v. Attorney General*, 425 F.3d 853, 858 (10th Cir. 2005). Because, as set out fully above,

[14](...continued)
purpose is to discover evidence creating a genuine issue of fact as to a petitioner's entitlement to habeas relief, the appropriate course is to employ Rules 6 and 7, rather than to request an evidentiary hearing. *See United States v. Velarde*, 485 F.3d at 553, 559-60 (10th Cir. 2007). Of course, the limitations set out in § 2254(e)(2) apply "when expansion of the record is used to achieve the same end as an evidentiary hearing." *Cargle v. Mullin*, 317 F.3d 1196, 1209 (10th Cir. 2003) (quotation and alteration omitted). Only when a petitioner diligently sought to develop the factual basis of a habeas claim in state court can he utilize the procedures set out in Rules 6 and 7. *Id.*

[15]The district court utilized this standard because the OCCA summarily denied Hooks's request for an evidentiary hearing. *See Bryan v. Mullin*, 335 F.3d 1207, 1215 (10th Cir. 2003) (en banc) (holding that when a petitioner seeks an evidentiary hearing in state court to develop the factual basis of a claim, but the state court denies such a hearing, entitlement to a federal court hearing is analyzed pursuant to pre-AEDPA law rather than the standards set out in § 2254(e)(2)). Under the particular facts of this case, however, § 2254(e)(2) might indeed operate as a limitation on Hooks's entitlement to an evidentiary hearing. Some aspects of Hooks's federal habeas claim of ineffective assistance were not embraced in his state-court request for an evidentiary hearing. Nevertheless, because Hooks is not entitled to an evidentiary hearing under any standard, we need not labor over the proper application of § 2254(e)(2) in this case.

each of Hooks's claims of ineffective assistance of trial counsel is resolvable solely on the basis of the existing record, the district court did not abuse its discretion in denying Hooks's general request for an evidentiary hearing. *Miller*, 161 F.3d at 1253. Likewise, the general and conclusory nature of the allegations in Hooks's request for an evidentiary hearing, fully support the district court's decision to deny that request. *Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995), *overruled in part on other grounds by Daniels v. United States*, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001) (en banc).

## V. PENALTY-PHASE *Allen* INSTRUCTION

*A. Clearly Established Supreme Court Precedent*

"The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." *Allen v. United States*, 164 U.S. 492, 501 (1896). This object is achievable only if individual jurors will "listen with deference to the arguments" of other jurors "with a distrust of [their] own judgment," particularly when "a large majority of the jury tak[es] a different view of the case." *Id.* at 501-02. For that very reason, the use of an *Allen* charge to encourage jury unanimity "has long been sanctioned" by the Supreme Court. *Lowenfield*, 484 U.S. at 237. The need for unanimity, however, is reduced in the context of penalty-phase proceedings because a deadlocked jury will not result in a mistrial. Okla. Stat. Ann. tit. 21, § 701.11 (providing that "[i]f the jury cannot,

-28-

within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life" with or without parole); *see also Lowenfield*, 484 U.S. at 238 (recognizing identical feature of Louisiana law reduced need for unanimity, noting that fact "obviously weighs in the constitutional calculus," but ultimately concluding it is not "dispositive"). Nevertheless, the state retains "a strong interest in having the jury express the conscience of the community on the ultimate question of life or death." *Lowenfield*, 484 U.S. at 238 (quotation omitted). Thus, even in death-penalty proceedings, trial courts are entitled to direct juries to deliberate for a reasonable time before declaring a mistrial. *Id.*

Nevertheless, "[a]ny criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body." *Id.* at 241. Accordingly, a trial court must be vigilant to instruct the jury in a way that, given all the surrounding circumstances, does not coerce the jury into returning a death verdict. *Id.* at 238-39 (noting that despite general propriety of encouraging additional deliberations through an *Allen* charge, Court was "naturally mindful . . . that the qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed"). In resolving whether any particular *Allen* charge crossed over the boundaries of propriety to coercion, reviewing courts must "consider the

-29-

supplemental charge given by the trial court in its context and under all the circumstances." *Id.* at 237 (quotation omitted).

The dissent spills much ink arguing that the rule set out in *Lowenfield* is sufficiently general that this court's review of the decision of the OCCA should be "'doubly deferential.'" Dissenting Op. at 9 (citing *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009)); *see also id.* at 3-9 (collecting cases). We have no reason to quibble with the dissent's assertion.[16] On the other hand, to the extent

---

[16]Although we agree with the dissent's assertion that *Lowenfield* is sufficiently general that this court's review of the OCCA's decision should be doubly deferential, we cannot agree with the dissent's unsupported assertion that the standard set out in *Lowenfield* is somehow less revealing than the standard set out in *Strickland*. Dissenting Op. at 8 & n.5 ("But unlike *Strickland* and it's progeny, which at least provide guidance for its application, *Lowenfield* establishes nothing more than a general (perhaps merely aspirational) principle without a hint as to how courts are to determine whether a Constitutional violation occurred." (footnote omitted)). The Supreme Court has made clear that the *Strickland* standard is purposefully general and context specific:

> We established the legal principles that govern claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Id.*, at 687. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id.*, at 688. *We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Ibid.*

*Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (emphasis added). This general standard has not prevented the Supreme Court from granting habeas relief applying the AEDPA deferential standard in an appropriate case. *Id.* at 537-38. Likewise, the rule set out in *Lowenfield* is necessarily general and context

(continued...)

-30-

the dissent is asserting "double deference" is a synonym for "abject deference,"

we simply note such an approach is precluded by this court's decision in *Snow*,

474 F.3d at 696, and the Supreme Court's decision in *Miller-El*, 537 U.S. at 340.

*B. Background*

*1. Trial Proceedings*

At the conclusion of the penalty-phase, the trial court instructed the jury it

had the duty to impose sentence upon Hooks. The trial court listed for the jury

the statutory aggravating circumstances at issue in the case, defined those

aggravating circumstances, and instructed the jury it was authorized to consider

imposing a sentence of death only if it first unanimously found beyond a

reasonable doubt that one or more of those aggravating circumstances existed.

The trial court defined the term "mitigating circumstances" and instructed the jury

that "unanimous agreement of jurors concerning mitigating circumstances is not

required." The trial court instructed the jury as to its task during the selection

phase of penalty deliberations[17] as follows:

---

[16](...continued)
specific, as an otherwise unremarkable *Allen* charge may be rendered coercive in light of remarkable surrounding circumstances. In contrast to the dissent's assertion, nothing in either the text of AEDPA or the decisions of the Supreme Court categorically rule out the availability of habeas relief under the rule set out *Lowenfield*.

[17]*See Tuilaepa v. California*, 512 U.S. 967, 971 (1994) (describing "eligibility decision" and "selection decision" and noting they together constitute the two phases in death penalty deliberations).

If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the death penalty shall not be imposed unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances. Even if you find that the aggravating circumstances outweigh the mitigating circumstances, you may impose a sentence of imprisonment for life with the possibility of parole or imprisonment for life without the possibility of parole.

The trial court concluded with a catch-all instruction stating as follows:

All the previous instructions given you in the first part of this trial apply where appropriate . . . .
     . . . .
You have already elected a foreperson. In the event you assess the death penalty, your verdict must be unanimous. You may also return a unanimous verdict of imprisonment for life without the possibility of parole or imprisonment for life with the possibility of parole. . . . When you have reached your verdict, all of you in a body must return it into open court.
The law provides that you shall now listen to and consider the further arguments of attorneys.

Consistent with the concluding line of the trial court's instructions, the case proceeded immediately to closing arguments. During those arguments, the prosecutors actively presented misleading statements to the jury as to the need for a unanimous verdict. The prosecution's closing arguments were presented in two parts. The first part was presented by Brad Miller. Miller set about to mislead the jury as to its sentencing role by informing jurors (1) the jury's work would be wasted if it failed to reach a unanimous verdict, (2) any argument by defense counsel that it took the vote of only one juror to prevent imposition of the death penalty amounted to a request for "jury nullification," and (3) failure to deliberate

-32-

in a manner leading to a unanimous verdict would amount to operating outside the

law.  Miller argued to the jury as follows:

> It [sic] is certainly nothing easy about asking 12 strangers that don't know each other to come into the room here and listen to all of this and end up with unanimity going in the same direction.  It's a tremendously difficult process and we know that.
>
> But again, it's the best system in the world.  And it requires, though, these 12 people, these 12 strangers to come together and collaborate, discuss, make a decision.  The system would actually grind to a halt.  Think about it.  It would grind to a screeching halt if juries didn't come together and do that.
>
> If we couldn't depend on 12 citizens to come together and go in the same direction, then we would never have a verdict.  There would never be a disposition.  Defendant[s] would go back to jail and wait for the next trial and they'd go back to jail and wait for the next trial and no one would ever be acquitted and no one would ever be sent on to the penitentiary.
> . . . .
> Now I suggest that [defense counsel] will probably say something to the affect [sic] that someone on this jury could hold up a decision.  He will likely tell you that it just takes one person to stop all this.  That is such a common argument down here that it's got a name.  It's called jury nullification.
>
> Nullification means an action impeding or attempting to prevent the operation or enforcement of the law.  Websters.  Nullification means an action impeding or attempting to prevent the operation of the law.
>
> In other words, to nullify a jury, a jury's job, a jury's efforts really requires only convincing one or two people to cripple it, to stop it.  And while I don't want to beat this down I have got to tell you one more time that that's not what we're about.  This system, and I remind you, is about deliberation.  To do otherwise eviscerates the system.  It cuts it up literally.  It cuts it up.  The very law that we live by.  The 12 of you must resolve this case, all 12, I suggest.

During his closing argument, defense counsel responded to Miller's

misstatements of the law by simply noting for the jury that the defense "will ask

and tell [the jury] that it only takes one" because "that happens to be the law in Oklahoma." Robert Macy then delivered the final segment of the prosecution's closing argument. Macy concluded his closing argument by reaffirming Miller's misstatements of Oklahoma law and by reasserting that any result other than a unanimous verdict would be anathema to the principles underlying our legal system:

> [Defense counsel] mentioned that any one of you can control the result in this trial and you can do that legally. But ladies and gentlemen, there is not one chair up there. There's [sic] 12. Twelve chairs. And there's [sic] 12 chairs for that purpose. The Constitution of the United States guarantees a person a trial by a jury of his peers, not by one person, by a jury of his peers.
> There's been far too much work go into this case. It's far too important in this case for someone to play martyr and try to hang it up.

After deliberating for approximately five hours, the jury sent a note to the trial court stating: "We're 11 to one in favor of the death penalty but one person who refuses to change refers on grounds not related to the law. The 11 request this juror be interviewed and replaced with an alternate." The trial court and the parties engaged in a colloquy as to how to best respond to the jury's note. Defense counsel requested an instruction to the jury consistent with OUJI-CR 4-83, the Oklahoma Uniform Jury Instruction specifically applicable to deadlocked death-penalty deliberations: "If, on further deliberation you are unable to agree unanimously as to punishment, I shall discharge you and impose a sentence of imprisonment for life without the possibility of parole or

imprisonment for life with the possibility of parole." The prosecution objected to instructing the jury pursuant to OUJI-CR 4-83, not on its content but on its timing. The prosecution asserted the instruction was an *Allen* charge and it was too early in deliberations to give the jury such a charge. The trial court rejected defense counsel's request and instructed the jury as follows: "Ladies and gentlemen of the jury, the law does not authorize me to grant your request. Please continue with your deliberation."

Within ten minutes the jury returned a note saying "We are unable to reach any unanimous sentence." Defense counsel immediately moved for a mistrial, noting (1) the jury's first note demonstrated it was operating under a misunderstanding of the law and (2) the short time-frame between the trial court's answer to the first note and the jury's assertion of deadlock demonstrated further deliberations would not be fruitful. The trial court overruled Hooks's motion for a mistrial on the grounds the jury had not deliberated long enough to justify such a request and stated it would give the *Allen* charge set out OUJI-CR 10-11. OUJI-CR 10-11 is the Oklahoma uniform *Allen* charge applicable to juries deadlocked during guilt-phase deliberations. Defense counsel objected to instructing the jury consistent with OUJI-CR 10-11, asserting that instruction failed to "fully explain the sentencing phase of a death penalty case." The trial court overruled defense counsel's objection, refused defense counsel's request to ask jurors whether

further deliberation would be helpful before giving the *Allen* charge, and

instructed the jury consistent with OUJI-CR 10-11.[18]

---

[18]The instruction given by the trial court in this case, which is virtually identical to the form version of OUJI-CR 10-11, with the exception of the time frames, states as follows:

This case has taken approximately 57 hours of trial time. You have deliberated for approximately 6 1/2 hours. You report to me that you are experiencing difficulty in arriving at a verdict.

This is an important case and a serious matter to all concerned. You are the exclusive judges of the facts; the court is the judge of the law. Now I most respectfully and earnestly request of you that you return to your jury room and resume your deliberations. Further open and frank discussion of the evidence and law submitted to you in this case may aid you in arriving at a verdict.

This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision. No juror should ever agree to a verdict that is contrary to the law in the court's instructions, nor find a fact or concur in a verdict which in good conscience he or she believes to be untrue.

This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in the spirit of fairness and candor. If at all possible, you should resolve any differences and come to a common conclusion, that this case may be completed. Each juror should respect the opinion of his or her fellow jurors, as he or she would have them respect his or hers, in an earnest and diligent effort to arrive at a just verdict under the law and the evidence.

You may be as leisurely in your deliberations as the case may require and take all the time necessary. The giving of this instruction at this time in no way means that it is more important than any other instruction. On the contrary, you should consider this instruction together with and as part of the instructions which I previously gave you.

In stating the foregoing, I again repeat: you are the judges of the facts; the court is the judge of the law. In making all statements made to you I have not, nor do I now, express or intimate, nor

(continued...)

At approximately 7:30 p.m., the jury sent out a note asking for its evening break. The trial court and the parties quickly realized the jurors expected to go home for the evening, as they had during first-stage deliberations. Both defense counsel and the prosecution objected to breaking sequestration during second stage deliberations. The trial court had the jury returned to the courtroom and instructed the jurors they were being sent for a dinner break and should "plan to commence with your deliberations when you do return."

While the jury was away for dinner, the trial court reserved a motel in case jurors wanted to break for the evening. After the jury returned from dinner, the court met with counsel and proposed telling the jurors about logistical considerations relating to the jury's choice to take a break from deliberations for the evening. In particular, the trial court proposed telling the jury that if it wanted to take an evening break, it must tell the court by 10:30 p.m. so that rooms could be secured for the evening. Defense counsel requested that the trial court first ask the jury whether further deliberations would be helpful before discussing with the jury the logistics of an overnight hotel stay. The trial court denied defense counsel's request and proceeded to instruct the jury that if it

[18](...continued)
indicate, in any way the conclusions to be reached by you in this case, nor do I intend in any way or manner to coerce a verdict, nor directly or indirectly to force a verdict in this case. I only ask that you return to your jury room and, again, diligently and earnestly under your oaths resume your deliberations.

wanted to take an evening break it must inform the court by 10:30 p.m. At no

point did the trial court tell the jury its deliberations would not continue

indefinitely. Forty minutes later the jury returned a unanimous death sentence.

### 2. *Oklahoma Appellate Proceedings*

On direct appeal, Hooks alleged that the combination of circumstances

cataloged above coerced the jury into returning a death sentence. *Hooks*, 19 P.3d

at 309. Despite recognizing multiple errors on the part of the trial court and

misconduct on the part of both Miller and Macy, the OCCA denied relief. *Id.* at

310-12, 314-16. The author of the majority opinion, Judge Chapel, would have

granted Hooks relief on the basis that the "dangerous combination" of "egregious

errors" "may have encouraged and perpetuated any jurors' misunderstanding of

the law." *Id.* at 312 nn.33, 36. Because Judge Chapel's colleagues "unanimously

disagree[d] with [him] as to [the] matter," he "yield[ed] to their collective

wisdom" and wrote the opinion to affirm. *Id.* at 312 n.36. Thus, some portions of

the opinion of the OCCA on direct appeal reflect only the views of Judge Chapel,

while some portions reflect the views of the court.[19]

_____

[19]In reflecting his individual views, Judge Chapel opined:
[P]rosecutorial misconduct in the second stage infected the
sentencing proceeding with unfairness and deprived Hooks of a fair
sentencing hearing. The second stage argument was especially
egregious, as the misstatements of law, combined with errors in
instruction . . . , suggested that a hung jury was somehow illegal.
This may have led to a misconception among the majority of Hooks's
jurors . . . . We have repeatedly condemned the Oklahoma County

(continued...)

The OCCA first took up Hooks's challenge to the way the trial court informed the jury it would be sequestered until the end of deliberations. *Id.* at 310. In particular, Hooks asserted that under all the circumstances, the trial court's logistics discussion with the jury "suggested jurors could not leave until they had a unanimous verdict" and thereby "put unbearable pressure on the holdout juror." *Id.* Although it recognized the inference "that the quick return of a verdict after this instruction suggests coercion," the OCCA rejected such an inference because every statement of the trial court during the logistics discussion amounted to an "accurate statement of law." *Id.*

The OCCA recognized that the trial court erred when, prior to releasing the jury for further deliberations after dinner, it failed to admonish jurors not to abandon their honestly held beliefs. *Id.* at 310 & n.25 (citing *Lowenfield* for

[19](...continued)
District Attorney's reliance on improper argument . . . . In addition to our warnings, federal reviewing courts have also repeatedly condemned Mr. Macy and prosecutors from his office for their habitual misconduct in argument. This Court has let this flagrant disregard of our rulings pass too long. The second stage argument here contained several comments the prosecutors knew to be error, included for the purpose of inflaming the jury's passions and encouraging a sentencing verdict based on passion or prejudice rather than the evidence. The errors in argument, combined with the errors in instructing the deadlocked jury, prejudiced Hooks's ability to receive a fair sentencing hearing. I believe the misstatements of law regarding jury nullification deprived Hooks of his right to a properly instructed capital jury, and ought to result in relief even if the other comments did not render the proceedings as a whole fundamentally unfair.

*Hooks*, 19 P.3d at 314 n.51 (citations omitted); *see also id.* at 317 n.57.

proposition that such an instruction lessens coercion on holdout jurors); *see also id.* at 310 ("Under those circumstances the trial court had a duty to ensure each juror understood his or her obligation to hold fast to firm convictions, and not to concur in a finding or verdict simply to reach a unanimous decision."). The OCCA concluded, however, that this error did not require reversal because (1) none of the trial court's other after-dinner instructions were improper; (2) "Hooks's jury had received a proper *Allen* instruction,[20] including the admonition at issue, within the preceding two or three hours"; and (3) "[t]here were no intervening substantive communications or instructions between the *Allen* instruction and the after-dinner exchange." *Id.* at 310.

The OCCA likewise agreed with Hooks that the trial court erred when it gave the *Allen* instruction set out in OUJI-CR 10-11, instead of the capital deadlock instruction set out in OUJI-CR 4-83. *Id.* at 310-11. It cursorily denied relief on the basis of this error, however, simply noting as follows:

> We continue to hold that an *Allen* instruction, while no longer the appropriate instruction under these circumstances, is not per se error in the second stage of a capital case. The trial court gave the correct *Allen* instruction. We have already determined that the trial court's actions were not inherently or explicitly coercive.

---

[20]In utilizing this terminology, it is clear the OCCA was simply stating that OUJI-CR 10-11 is, in the abstract, a properly stated *Allen* instruction, not that it is the proper instruction to give to a jury deadlocked during penalty-phase deliberations. *Hooks*, 19 P.3d at 310 ("Hooks claims the trial court erred in refusing to give the capital deadlock instruction, OUJI-CR (2d) 4-83. Hooks is right.").

*Id.* at 312.

The OCCA rejected Hooks's contention that the jury's initial note to the
court, the note requesting removal of a juror who refused to vote with the
majority, indicated a misunderstanding of the law which should have been
remedied by an instruction similar to OUJI-CR 4-83. *Id.* The OCCA noted it was
"troubled by the suggestion that the jury believed Oklahoma law required
imposition of the death penalty." *Id.* It nevertheless concluded Hooks's assertion
of error failed because the jury was properly instructed as to both the eligibility
and selection phases of death-penalty deliberations.[21] *Id.*

Finally, the OCCA agreed with Hooks's contention that the prosecutors
misstated the law in an attempt to "diminish[] the jury's individual sense of
morality and mercy." *Id.* at 316. In particular, the OCCA noted Miller and Macy
had misstated the law in three key ways:

> First, all twelve jurors do not have to unanimously agree in capital
> sentencing proceedings. Second, the failure to agree does not
> amount to jury nullification. Oklahoma law specifically provides
> that the jury may not reach a unanimous verdict. As the law provides

_____

[21]In this regard, the OCCA stated as follows:
The jury was accurately instructed that it was authorized to impose
the death penalty if it unanimously found one or more aggravating
circumstances, and then found that circumstance outweighed any
mitigating evidence. Nothing in the instructions suggested the jury
was required to impose a death sentence if it found at least one
aggravating circumstance. Instruction 11 told the jury it could
impose a sentence of life or life without parole even after finding
aggravating circumstances outweighed mitigating circumstances.
*Hooks*, 19 P.3d at 312.

for this result, failure to agree cannot be said to impede or obstruct it. Third, deadlocked juries are instructed not to abandon their honestly held convictions or concur in a verdict which they cannot in good conscience accept . . . while attempting to resolve their differences. The closing arguments complained of here suggest jurors should in fact abandon their honestly held beliefs if those beliefs will result in a less than unanimous verdict.

*Id.* (footnote omitted). Ultimately, however, the OCCA denied relief, simply concluding that "despite these erroneous arguments the jury was deadlocked for several hours. We must conclude that the jurors in this case were not misled."

*Id.*

### 3. *Federal District Court Habeas Proceedings*

The district court concluded Hooks was not entitled habeas relief because the OCCA's resolution of his jury-coercion claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. In analyzing the *Allen* charge, the district court utilized the four factors identified by this court in *United States v. Arney*, 248 F.3d 984, 988 (10th Cir. 2001)[22]: "(1) the language of the instruction, (2) whether the instruction is presented with other instructions, (3) the timing of the instruction, and (4) the length of the jury's subsequent deliberations."

---

[22]An *Arney* analysis, though helpful in reviewing a claim of jury coercion in habeas proceedings, is not dispositive under the AEDPA. *Gilbert v. Mullin*, 302 F.3d 1166, 1173 n.3 (10th Cir. 2002) ("Although *Arney* sets forth the factors under which a federal appellate court reviews the supplemental jury instructions used by a federal district court, we note that this standard is higher than our more deferential review pursuant to AEDPA.").

The district court noted the trial court's instruction was a "modified" *Allen* charge, a supplemental instruction in which the court asks all jurors, rather than only those in the minority, to carefully consider their views. *See Gilbert v. Mullin*, 302 F.3d 1166, 1173-74 (10th Cir. 2002) (discussing how "modified" *Allen* charge differs from "traditional" *Allen* charge). Such instructions generally do not "unduly emphasize the importance of reaching a verdict." *Id.* at 1174. Thus, the district court concluded the language of the *Allen* charge itself was not coercive.

The district court recognized the jury was presented with many instructions discussing unanimity, but was presented with no instruction indicating unanimity was not required as to the ultimate sentence imposed or the consequences if the jury was unable to reach unanimity. Nevertheless, the district court relied on precedent indicating the Eighth Amendment does not require a trial court to instruct the jury on the consequences of their failure to agree. *See Neill v. Gibson*, 278 F.3d 1044, 1053-54 (10th Cir. 2001) (discussing Eighth Amendment implications of failing to instruct jury on consequences of not reaching a unanimous verdict during penalty phase of capital trial). Furthermore, according to the district court, Hooks's trial counsel argued to the jury during closing arguments that the jury did not have to be unanimous and that if one or more

jurors held out death would not be imposed.[23]  Thus, according to the district

court, the OCCA's determination that the instructions as a whole did not coerce

the jury was not an unreasonable application of *Lowenfield*.

As to the timing of the *Allen* instruction, the district court simply noted that

prior to the giving of the charge, the jury had not absolutely declared further

deliberations would be fruitless.  Furthermore, the instruction was given in the

afternoon, rather than late at night.  According to the district court, there was

nothing in the timing of the *Allen* charge that rendered it coercive.  The district

court did not, however, recognize that the *Allen* instruction was given soon after

the second jury note indicating an inability to reach a unanimous verdict and after

the request of Hooks's counsel to inquire of the jury whether further deliberations

would be meaningful.

Finally, the district court acknowledged that the jury deliberated for

approximately two and one-half hours after receiving the *Allen* charge before

returning a verdict.  Citing several cases from this court, the district court

concluded that substantial time gap weighed against Hooks's jury-coercion

argument.

In conclusion, the district court stated:

---

[23]Based solely on these limited arguments on the part of defense counsel
during closing arguments, the district court eliminated from the coercion equation
the misconduct on the part of the prosecutors.  As set out more fully below, this
erroneous legal ruling seriously undermines the district court's coercion analysis.

Considering the totality of the circumstances in which the *Allen* charge was given in [Hooks's] case, the Court concludes that it was not coercive in such a way as to deny him a fair trial and due process of law. The OCCA's determination that [Hooks] was not entitled to relief is neither contrary to, nor an unreasonable application of, clearly established federal law.

## C. Analysis

### 1. AEDPA Deference

Hooks asserts the trial court's *Allen* instruction, "in its context and under all the circumstances," was so coercive as to deny him a reliable sentencing proceeding. *Lowenfield*, 484 U.S. at 237 (quotation omitted). He further argues this court should review his jury coercion claim de novo because the OCCA's compartmentalized adjudication of the claim is contrary to *Lowenfield*. *See Brown v. Uphoff*, 381 F.3d 1219, 1225 (10th Cir. 2004) (holding that when a state court adjudication is contrary to clearly established Supreme Court precedent, this court must review de novo whether petitioner is entitled to habeas relief). In the alternative, Hooks argues the record-based indicia of coercion are so overwhelming that the OCCA's refusal to grant relief on this issue amounts to an unreasonable application of *Lowenfield*. 28 U.S.C. § 2254(d)(1).

Hooks asserts that in contrast to *Lowenfield*'s clear direction to review the coerciveness of an *Allen* charge under the totality of the circumstances, 484 U.S. at 237, the OCCA reviewed the factors bearing on this question individually and in isolation. Oklahoma, on the other hand, asserts the OCCA used a totality-of-

-45-

the-circumstances test consistent with *Lowenfield*, relying on footnote 33 of the OCCA's opinion. *See Hooks*, 19 P.3d at 312 n.33. The problem with Oklahoma's assertion, of course, is that footnote 33 of the OCCA's opinion represents only the views of Judge Chapel. *Id.* ("I note the errors in instruction were exacerbated by the egregious errors in argument discussed in Proposition II [involving prosecutorial misconduct]. I believe this dangerous combination warrants relief."); *see also supra* Section V.B.2 (discussing unusual nature of OCCA opinion, in which the author of the opinion dissented from the outcome on this issue in a series of footnotes).

It is certainly true that Judge Chapel considered the coerciveness of the *Allen* charge given during the penalty phase in light of all the surrounding circumstances. *Hooks*, 19 P.3d at 312 nn.33 & 36, 314 n.51, 317 n.57, 318 n.68. Whether the OCCA majority undertook to analyze Hooks's claim in a manner consistent with *Lowenfield* cannot be definitively determined from the opinion. Although the opinion of the OCCA cites to *Lowenfield* in two footnotes, it does so only to briefly note (1) a quick return of a verdict following an *Allen* charge can indicate coercion, (2) an instruction to a deadlocked jury not to surrender honestly held beliefs reduces coercion, and (3) a jury instruction as to the consequences of failing to reach unanimity reduces coercion. *Hooks*, 19 P.3d at 310 & n.24; *Id.* at 310 n.25. *But cf. Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (holding AEDPA's "contrary to" clause "does not require citation of our cases—indeed, it

does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them"). Nowhere does the OCCA indicate it is evaluating the coerciveness of the *Allen* charge given at Hooks's trial by reference to all surrounding circumstances. *But cf. id.* at 9 ("Compliance with *Lowenfield* . . . does not demand a formulary statement that the trial court's actions and inactions were noncoercive 'individually and cumulatively.' It suffices that that was the fair import of the [state court] opinion."). Nor does the "fair import" of the OCCA opinion indicate the court undertook such a highly contextualized analysis. *Id.*; *cf. infra* Section V.C.2.b. (discussing OCCA's compartmentalized analysis of Miller's and Macy's prosecutorial misconduct).

There are, however, indications the OCCA aggregated all "errors" in deciding this (possibly distinct) question: Was Hooks afforded a fundamentally fair sentencing proceeding? *Hooks*, 19 P.3d at 318 ("[W]e find the combination of errors [surrounding the *Allen* charge] did not infect the . . . sentencing proceeding with unfairness, and does not require relief."); *see also id*. at 312 n.36 (stating that although Judge Chapel thought the constellation of errors surrounding the trial court's *Allen* charge required relief, his "colleagues . . . unanimously disagree[d]"); *id.* at 314 n.51 (same). The OCCA's "combination of errors," however, excludes other relevant contextual circumstances, such as the timing of the *Allen* instruction, the significance of the jury notes, and the impact of the trial court's decision to give the instruction to an apparently deadlocked

-47-

jury.  Whether the limited analysis set out in the text of the OCCA opinion is consistent with *Lowenfield*'s "coercion" analysis is problematic.  *Cf. Fry v. Pliler*, 127 S. Ct. 2321, 2325 n.1 (2007) (assuming state court determination of "'no possible prejudice'" did not amount to an application of the harmless-beyond-a-reasonable-doubt standard set out in *Chapman v. California*, 386 U.S. 18 (1967)).

Unfortunately, neither party has directed this court to any relevant precedent on that question.  Likewise, it is impossible to tell from Judge Chapel's footnotes the exact basis upon which his colleagues disagreed with him, i.e., the mode of his analysis or his conclusion.  Ultimately, because Hooks is entitled to habeas relief even under AEDPA's deferential review for objective reasonableness, we decline to resolve the very difficult question of whether the analysis of the OCCA is "contrary to" *Lowenfield*.  Accordingly, this court proceeds to the question whether the OCCA's denial of relief on Hooks's claim his death sentences were coerced is an unreasonable application of the general standard set out in *Lowenfield*.

### 2. *Discussion*

This court approaches the OCCA decision fully cognizant of the limited nature of federal habeas review under the provisions of AEDPA.  *See supra* Section III. (explicating § 2254(d)(1)'s review standards).  The deference accorded that decision, however, is not abject, and the record in this case so overwhelmingly demonstrates the jury's death sentences were coerced that the

OCCA's contrary decision is not just wrong, it is unreasonable. *See Snow*, 474 F.3d at 696 (noting that despite § 2254(d)'s high standard, it does not require "abject deference" on the part of this court); *McLuckie*, 337 F.3d at 1197 (noting this court cannot grant habeas relief unless the relevant state court decision is both wrong and objectively unreasonable). As set out more fully below, the record in this case reveals an ever-rising tide of coercion ultimately resulting in five unanimous death sentences. From the initial jury instructions, focused narrowly on the concept of unanimity; to misconduct on the part of the prosecutors, designed to mislead the jury about its role in the sentencing process and the need for unanimity; to the note from the jury singling out a lone juror as operating outside the law by refusing to concur in a death verdict, a note demonstrating the jury's misunderstanding of law consistent with the prosecutors' misleading closing arguments; to the trial court's unadorned response that it lacked the power to remove the lone dissenting juror, a response failing in any way to correct the jury's express misunderstanding of its role in the sentencing process; to the trial court's guilt-phase-focused *Allen* charge, reinforcing the need for unanimity so the "case may be completed"; to the trial court's discussion with the jury, undertaken in response to the jury's wish to return home for the evening, informing the jury its only options were to deliberate into the night or return to deliberate in the morning after spending the night at a hotel, the record in this

-49-

case so indicates jury coercion that it was an unreasonable application of *Lowenfield* for the OCCA to deny Hooks relief.

### a. Initial Second Stage Jury Instructions

Placing the *Allen* charge in context, as required by *Lowenfield*, begins by recognizing that the relevant instructions given by the trial court prior to closing arguments exclusively discussed the concept of unanimity, even with regard to the possible non-death sentences. For example, Instruction Number 14 stated as follows:

> In the event you assess the death penalty, your verdict must be unanimous. You may also return a unanimous verdict of imprisonment for life without the possibility of parole or imprisonment for life with the possibility of parole. When you have reached your verdict, all of you in a body must return it into open court.

There is, however, no discussion in the instructions of the effect of the jury failing to reach a unanimous verdict. This court certainly recognizes that such an instruction is required only in unusual circumstances. *See Jones v. United States*, 527 U.S. 373, 381-82 (1999) (holding Eighth Amendment does not require trial courts to instruct jury on consequences of failure to agree on sentence, unless to fail to do so would affirmatively mislead the jury regarding its role in the sentencing process). Nevertheless, the failure to so inform the jury is certainly one of the contextual circumstances bearing on the question of jury coercion in this particular case. *Lowenfield*, 484 U.S. at 234 (recognizing that before the case

-50-

was submitted to the jury, the trial court "charged the jury that if it were unable to reach a unanimous recommendation, the court would impose a sentence of life imprisonment without the possibility of parole"); *Darks v. Mullin*, 327 F.3d 1001, 1014 (10th Cir. 2005) (noting inclusion of language consistent with Okla. Stat. Ann. tit. 21, § 701.11 reduces possibility of coercion flowing from *Allen* charge). The absence of such an instruction is particularly meaningful in this case given the prosecutorial misconduct—misrepresenting the jury's duty under Oklahoma law to reach a unanimous verdict—that occurred immediately after the initial penalty-phase instructions. *Jones*, 527 U.S. at 381-82.

### b. *Prosecutorial Misconduct*

The concluding line of the trial court's penalty-phase instructions admonished the jury as follows: "The law provides that you shall now listen to and consider the further arguments of attorneys." The prosecutors, Miller and Macy, then immediately proceeded to mislead the jury as to its role in sentencing by informing jurors (1) the jury's work would be wasted if it failed to reach a unanimous verdict, (2) defense counsel's argument that it took the vote of only one juror to prevent imposition of the death penalty constituted a request for "jury nullification," and (3) failure to deliberate in a manner leading to a unanimous verdict would amount to operating outside the law. *Hooks*, 19 P.3d at 316.[24]

---

[24]The OCCA summarized Miller and Macy's clear misstatements of law: (1) juror unanimity is not required in capital sentencing proceedings; (2) the

(continued...)

Thus, immediately following the jury instructions, which spoke only of unanimity, the prosecutors engaged in intentional misconduct designed to misinform the jurors that it is improper for individual jurors to holdout against a majority vote and thereby prevent a unanimous verdict.[25]  There is no doubt the

_____

[24](...continued)
failure to agree is not jury nullification and it does not impede or obstruct enforcement of the law; and (3) jurors are not to abandon honestly held beliefs to avoid a less than unanimous verdict. *Hooks*, 19 P.3d at 316.

[25]Footnote 51 of the OCCA's opinion specifically states that this misconduct was intentional and calculated to mislead the jury. *Hooks*, 19 P.3d at 314 n.51 ("The second stage argument here contained several comments the prosecutors knew to be error, included for the purpose of inflaming the jury's passions and encouraging a sentencing verdict based on passion or prejudice rather than the evidence.").  While the bulk of footnote 51 consists of the individual views of Judge Chapel, it is unclear whether this specific view is shared by the majority.  The context, extent, and repetition of the second-stage misconduct of Miller and Macy in this case, together with their history of misconduct in death penalty cases, confirms the characterizations set out in footnote 51.  "Our past experiences with [these prosecutors] leave us convinced that [their] 'inappropriate' commentary was intentional and calculated." *Duckett v. Mullin*, 306 F.3d 982, 993-94 n.4  (10th Cir. 2002) (discussing at length Macy's history of prosecutorial misconduct, including his misconduct in this very case (citing *Hooks*, 19 P.3d at 314 n.51)); *Paxton v. Ward*, 199 F.3d 1197, 1216-18 (10th Cir. 1999) (labeling misconduct on the part of Macy as "deceitful[]"); *Douglas v. Workman*, 560 F.3d 1156, 1190 (10th Cir. 2009) (per curiam) (granting habeas relief on the basis Miller engaged in "deliberate deception of a court and jurors by the presentation of known false evidence" and "took affirmative steps, [after the trial was completed], to cover up" his misconduct).  More telling, however, the OCCA itself, a court far more familiar with Macy and the attorneys from his office, has likewise noted the repetitive and recalcitrant nature of the misconduct committed by Macy and his attorneys. *Hooks*, 19 P.3d at 314 n. 51 (collecting federal habeas cases discussing misconduct); *id.* at 316-17 & n.55 (collecting OCCA opinions for proposition that Macy's office consistently ignored OCCA opinions directing that prosecutors stop engaging in improper death-phase arguments).  As this court has previously noted, "Macy's persistent

(continued...)

intentional misconduct on the part of Miller and Macy violated Hooks's constitutional rights.

The Supreme Court has held that "the jury must not be misled regarding the role it plays in the sentencing decision." *Romano v. Oklahoma*, 512 U.S. 1, 8 (1994); *see also id.* at 9 (noting that to establish an Eighth Amendment violation, "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law" (quotation omitted)); *Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985) (applying heightened review to prosecutorial misconduct because prosecutor sought to mislead jury about "its role in the capital sentencing procedure"). More specifically, the Court has likewise indicated that misstatements to the jury regarding the consequences of deadlock "could give rise to an Eight Amendment problem." *Jones*, 527 U.S. at 381-82. This court recently applied *Jones* in a context analogous to the case at hand. *See Neill*, 278 F.3d at 1053-54.

In *Neill*, the petitioner asserted the trial court's failure to instruct the jury on the consequences of deadlock deprived him of his Eighth Amendment rights. *Id.* at 1053. Key to the petitioner's claim was the following isolated misstatement

[25](...continued)
misconduct . . . has without doubt harmed the reputation of Oklahoma's criminal justice system and left the unenviable legacy of an indelibly tarnished legal career." *Duckett*, 306 F.3d at 994. In light of the record in this case, the opinion of the OCCA on direct appeal, and the history of these two prosecutors, the dissent's efforts to rehabilitate Miller and Macy and minimize their misconduct, Dissenting Op. at 9-22, are wholly unconvincing.

of Oklahoma law on the part of the prosecutor during his closing argument: if the jury was unable to reach a unanimous verdict, the result would be a retrial. *Id.* In rejecting the petitioner's Eighth Amendment claim, this court noted that following this isolated misstatement, the prosecutor correctly stated "that if defense counsel could get one juror to vote against the death penalty, that punishment could not be imposed." *Id.* Furthermore, in the defense's closing argument, petitioner's counsel accurately informed the jury that if a single juror refused to vote for death, the trial court would declare a deadlock and impose a life sentence. *Id.* Finally, in the concluding segment of his closing argument, the prosecutor again correctly noted there could be no "mistrial" at sentencing and if a single juror opposed the death penalty, the petitioner would receive a life sentence. *Id.* Not surprisingly, in light of that record, this court concluded "the prosecutor's single misstatement did not mislead the jury concerning its sentencing role. An instruction on the consequences resulting from the jury's failure to reach a unanimous sentencing decision, therefore, was unnecessary." *Id.* at 1053-54 (citing *Jones*, 527 U.S. at 381-82).[26]

---

[26]The district court relied on *Neill* to conclude Miller's and Macy's misconduct had no impact on the jury's penalty-phase deliberations because defense counsel properly described for the jury its role at sentencing during his closing argument. *See supra* n.22. Unlike in *Neill*, however, Miller and Macy made multiple, intentional misstatements to the jury regarding its role at sentencing. As part of that misconduct, Miller anticipated defense counsel's closing arguments regarding the jury's proper role at sentencing and told the jury defense counsel's arguments amounted to a request for "jury nullification," an

(continued...)

Unlike the case in *Neill*, the prosecutors here engaged in wholesale and repeated attempts to mislead the jury as to its sentencing role under Oklahoma law. The OCCA specifically held that Miller's and Macy's remarks were wholly inconsistent with Oklahoma law. *Hooks*, 19 P.3d at 316; *supra* n.23 (setting forth OCCA's conclusion that Miller and Macy misstated Oklahoma law regarding the jury's sentencing role in three key particulars). Thus, it seems apparent Miller's and Macy's misconduct invaded Hooks's Eighth Amendment rights by suggesting "jurors should in fact abandon their honestly held beliefs if those beliefs will result in a less than unanimous verdict." *Hooks*, 19 P.3d at 316. By "improperly describing the role assigned to the jury by local law," the prosecutors thereby caused the jury to "feel less responsible than it should for the sentencing decision." *Romano*, 512 U.S. at 9 (quotations omitted).

Nevertheless, the OCCA denied relief on this ground, holding as follows: "[D]espite [the prosecutors'] erroneous arguments the jury was deadlocked for several hours. We must conclude the jurors were not misled." *Hooks*, 19 P.3d at

---

[26](...continued)
illegal practice at odds with the very foundations of this country's legal system. With this background in mind, it is simply not reasonable to conclude that defense counsel's brief statements during closing arguments cured any and all ill effects flowing from Miller's and Macy's intentional misconduct. This was verified when the jury in this case sent a note to the trial court asserting a single juror was operating at odds with the law by refusing to change her vote to ensure a unanimous verdict. Thus, the district court committed a critical legal error in relying upon *Neill* and removing from the coercion equation the misconduct on the part of Miller and Macy.

316. That ruling amounts to "an unreasonable determination of the facts in light of the evidence presented" during the penalty phase of Hooks's trial. 28 U.S.C. § 2254(d)(2).[27] The mere fact the jury remained deadlocked for "several hours" after the misconduct says very little about the misconduct's impact. The record simply reveals that one single juror was unconvinced, at least for a period of time,

_____

[27]Both parties identify this determination (i.e., the jury was not misled) as one of fact subject to review under 28 U.S.C. § 2254(d)(2). It is possible, however, that the OCCA was instead expressing that Miller's and Macy's misconduct was harmless. As set out below, this court concludes it is unnecessary to decide whether Hooks is entitled to habeas relief based solely on the prosecutors' misconduct because he is entitled to habeas relief on the basis of his *Lowenfield* claim, a claim that includes as only a part of its calculus the misconduct of Miller and Macy. To be clear, this court's conclusion that the jury was misled does not, standing alone, entitled Hooks's to habeas relief. Instead, it would be necessary to determine whether that misconduct was harmless under one of the potentially applicable standards of review. *See*, *e.g.*, *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (Applicable standard of review in habeas "is whether the error had substantial and injurious effect or influence in determining the jury's verdict. Under this standard, habeas petitioners . . . are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." (quotations and citation omitted)); *id.* at 638 n.9 ("Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict."); *Duckett*, 306 F.3d at 992 ("The Eighth Amendment requires that sentencing procedures in a capital case be evaluated under a heightened standard of reliability. We have therefore held that the standard governing appellate review of closing arguments during the sentencing stage of capital cases is whether the comments might have affected the sentencing decision." (quotation, alteration, and citation omitted)). Because we do not resolve whether Hooks is entitled to habeas relief solely on the basis of prosecutorial misconduct, we also need not resolve what standard of review would apply should the OCCA's ruling be considered a determination of harmlessness.

to abandon her honestly held beliefs in order for the jury to reach unanimity. The passage of time does not rule out the possibility that other jurors also favored a life sentence, but acquiesced in a death sentence because they believed holding out would amount to, in the words of Miller, "impeding or attempting to prevent the operation or enforcement of the law."

More importantly, unlike in *Neill*, the record contains a singularly clear indication Miller's and Macy's misconduct did, in fact, mislead the jury. After deliberating for several hours, the jury sent a note to the trial court indicating as follows: (1) it was eleven to one in favor of imposing the death penalty; (2) the sole holdout juror refused to change her vote "on grounds not related to the law," and (3) the eleven jurors favoring death unanimously requested the trial court to remove the holdout juror and replace her with an alternate. *Hooks*, 19 P.3d at 308, 312. A review of the entire state court record indicates that the assertion in the jury note flowed directly from the prosecutors' misconduct. There is a complete absence from the trial transcript of any other basis for the jury to conclude unanimity was the overriding obligation of the jury. Thus, this court concludes the OCCA's determination that the jury was not misled by the prosecutors' intentional misstatements of law is so at odds with the state court record as to be unreasonable. 28 U.S.C. § 2254(d)(2).[28]

_____

[28]Surprisingly, in analyzing whether Miller's and Macy's misconduct misled the jury, the OCCA did not consider the jury's note. *Hooks*, 19 P.3d at
(continued...)

Although Hooks makes a strong argument that he is entitled to habeas relief solely on the basis of Miller's and Macy's misconduct,[29] this court need not definitively resolve that question. As set out above, it is clear the prosecutors' misconduct achieved its intended purpose: the jury was misled to believe it was

_____

[28](...continued)
316. This failure to account for the jury's note in its analysis of prosecutorial misconduct most likely flows from the OCCA's rejection, as "pure speculation," Hooks's claim that the jury's note demonstrated it misunderstood its role at sentencing. *Id.* According to the OCCA, because nothing in the trial court's instructions mandated the imposition of the death penalty, ipso facto, the jury could not have been misinformed about its role. *Id.* This conclusion, whether one of fact or law, is unreasonable. 28 U.S.C. § 2254(d).

The jury's note made clear at least eleven jurors were operating under a mistaken view of Oklahoma law. Those jurors stated that in refusing to change her vote, the holdout juror was acting in derogation of Oklahoma law. *But see Hooks*, 19 P.3d at 316 ("[A]ll twelve jurors do not have to unanimously agree in capital sentencing proceedings. . . . [T]he failure to agree does not amount to jury nullification."). This was precisely the mistaken impression Miller and Macy set about to instill in the jury. The prosecutors argued the jury had a duty to reach a unanimous verdict and if any single juror refused to go along, that juror was engaging in the unlawful practice of "jury nullification." This misconduct is the one and only record-based explanation for the misunderstanding reflected in the jury's note.

In light of the record in this case, it would certainly have been reasonable for the OCCA to conclude the jury's misunderstanding of the law did not flow from the trial court's penalty-phase instructions. The OCCA's follow-up conclusion, that because the jury's confusion did not flow from those instructions it did not exist, however, is inconsistent with the state court record. In completely discounting the jury's note from its coercion calculus, the OCCA did not just err, it reached an unreasonable determination in light of the record before it. 28 U.S.C. § 2254(d).

[29]*See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (holding the Eighth Amendment requires that sentencing procedures in capital cases be evaluated under a heightened standard of reliability); *Coleman v. Brown*, 802 F.2d 1227, 1238-39 (10th Cir. 1986) (same).

-58-

the obligation of a juror holding a minority opinion to abandon that opinion if it was necessary for the jury to reach a unanimous sentence. The coercion flowing from this misconduct, when combined with coercion flowing from the trial court's *Allen* charge, undoubtedly coerced the jury's death sentences. Accordingly, it is unnecessary to determine whether Miller's and Macy's misconduct, standing alone, entitles Hooks to habeas relief.

### c. *The First Jury Note*

Beyond verifying the impact of the prosecutorial misconduct, the first jury note has further demonstrative significance to the jury-coercion question. That first jury note, which disclosed the jury's numerical division and the eleven-to-one majority favoring death, commenced a quickly unfolding series of communications between the jury and the court, culminating in the *Allen* charge, the incorrect instruction to a dead-locked jury in an Oklahoma capital case.

In response to the jury's note requesting removal of the sole holdout juror, the trial court consulted with defense counsel and the prosecutors. Defense counsel immediately argued the trial court should dispel the jury's misunderstanding about the legality of a juror refusing to vote for the death penalty by giving the jury the appropriate capital deadlock instruction in OUJI-CR 4-83, informing the jury the court would impose a life sentence should it remain unable to reach a unanimous verdict. *Cf. Lowenfield*, 484 U.S. at 240 (noting petitioner's failure to object to state court's jury poll "indicates that the

potential for coercion argued [on appeal] was not apparent to one on the spot"). The trial court overruled defense counsel's request and simply informed the jury it lacked the power to remedy the situation: "Ladies and gentlemen of the jury, the law does not authorize me to grant your request. Please continue with your deliberations."

The trial court's failure to rectify the jury's misunderstanding, by giving Oklahoma's capital deadlock instruction as requested by defense counsel, ramped up the pressure on the lone holdout juror to capitulate and reach a unanimous verdict. That is, rather than correct the jury's misunderstanding that the holdout had a legal obligation to abandon her views for the sake of unanimity, the trial court's message served to heighten the frustrations of the jurors by indicating nothing more than the court was powerless to address the majority jurors' apparently valid concerns. As indicated by defense counsel's objection, and under all the circumstances, the coercive nature of the trial court's handling of the jury's note was readily apparent at that time. *Id.*

The jury's note also contributed to an atmosphere of coercion in other ways. Hooks asserts the jury's note, which disclosed the panel's numerical division and that an eleven-to-one majority favored death, further increased the pressure on the holdout juror to accede to the majority's wishes and change her vote. *Id.* at 239-41 (recognizing that in certain circumstances, polling of the jury could be relevant to the question of coercion on habeas review). In the exercise

of its supervisory powers over federal courts, the Supreme Court has set out a per se rule: inquiry by a court into a jury's numerical division is so inherently coercive it mandates reversal of a conviction. *Brasfield v. United States*, 272 U.S. 448, 449-50 (1926). A number of courts have held that *Brasfield*'s per se rule applies whether the trial court learns of the jury's numerical division through polling or through spontaneous disclosure. *See*, *e.g.*, *United States v. Lloyd*, 515 F.3d 1297, 1302-03 (D.C. Cir. 2008); *Sanders v. Lamarque*, 357 F.3d 943, 944 (9th Cir. 2004).

*Brasfield*'s per se rule does not, however, apply in the habeas context. *Lowenfield*, 484 U.S. at 240 n.3. Nevertheless, *Brasfield* is "instructive as to the potential dangers of jury polling." *Id.* at 240; *Gilbert v. Mullin*, 302 F.3d 1166, 1175-76 (10th Cir. 2002). In *Gilbert*, this court concluded a state court's poll of the jury prior to, and in concert with, the giving of a *Allen* charge did not coerce the jury because: (1) the poll "garnered only information concerning the numerical division of the jury and carefully avoided eliciting information concerning the direction in which the jury was leaning; (2) the court never learned which specific jurors were in the minority; and (3) the poll did not disclose "the precise numerical division amongst the jurors." *Id.* at 1176 & n.5. In this case, on the other hand, the jury's note told the court the exact numerical split, the direction the jury was leaning, and that the eleven jurors in the majority believed the holdout was illegally refusing to change her vote. That the trial court gave an

*Allen* charge within a few minutes of the disclosure of the information that there was but one holdout against the death penalty certainly bears on the coerciveness of the *Allen* charge. *Lowenfield*, 484 U.S. at 240.

          *d. The* Allen *Charge*

No more than ten minutes after the trial court told the jury it was without power to replace the holdout juror with an alternate, the jury sent a second note to the trial court indicating it was "unable to reach any unanimous sentence." At a conference in chambers, the trial court informed the parties it intended to give the *Allen* charge set out in OUJI-CR 10-11. *See supra* n.17 (setting out text of OUJI-CR 10-11). Macy agreed this was the appropriate course of action. Defense counsel objected to the giving of OUJI-CR 10-11 as inapplicable to the penalty phase of a capital trial and, instead, requested that the trial court give the capital deadlock instruction set out in OUJI-CR 4-83. *Lowenfield*, 484 U.S. at 240 (noting that presence of defense objection is relevant to appearance of coercion flowing from giving of *Allen* charge). The trial court overruled defense counsel's objection and instructed the jury consistent with OUJI-CR 10-11.

On direct appeal, the OCCA concluded the trial court erred in giving OUJI-CR 10-11 to a deadlocked capital jury during penalty-phase deliberations. *Hooks*, 19 P.3d at 312. It nevertheless concluded the *Allen* charge actually given was not inherently coercive. *Id.* Hooks asserts the trial court's failure to give the correct Oklahoma deadlock instruction weighs heavily in favor of habeas relief.

It is clear, however, that "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quotation omitted). Thus, this court's task is simply to analyze whether the OCCA's determination—that the *Allen* charge actually given was not coercive under the totality of the circumstances—is an unreasonable application of *Lowenfield*. 28 U.S.C. § 2254(d)(1). Hooks is certainly correct to note, however, that the absence of a correct statement to the jury regarding the consequences of failing to reach a unanimous verdict is relevant to the question of the coerciveness of an *Allen* charge. *Lowenfield*, 484 U.S. at 234; *Darks*, 327 F.3d at 1012, 1014.

This court has approved an instruction nearly identical[30] to the one given here. *Gilbert*, 302 F.3d at 1171-73, 1176 (10th Cir. 2002). In *Gilbert*, this court concluded there was nothing inherently coercive in the language of this type of instruction. *Id.* at 1174 (citations omitted). In *Gilbert*, however, the *Allen* instruction was not given against a backdrop of misconduct on the part of prosecutors intentionally designed to convince the jury that holding out against a

---

[30]The only material difference between the *Allen* instruction in *Gilbert* and the one at issue here is that the *Gilbert* instruction asked the jury to "try one more time" to reach a unanimous verdict. *Gilbert*, 302 F.3d at 1173; *id.* at 1175 (noting instruction "clearly signal[ed] to the jury it would not be held indefinitely"). Here, on the other hand, there was nothing to indicate any kind of durational limit on deliberations. Furthermore, as set out more fully below, the discussions between the trial court and the jury regarding lodgings for the night certainly magnified the appearance the trial court expected significant, and perhaps indefinite, additional deliberation. Thus, the otherwise subtle difference between the instruction given in *Gilbert* and the one given here is not without significance, especially considering the differing contexts.

majority verdict was an exercise in illegal "jury nullification."  Nor did the *Allen*

instruction in *Gilbert* follow a note from the jury disclosing its numerical division

and asking the trial court to remove a juror because she refused to change her

vote to one in favor of the death penalty for a legally illegitimate reason.  These

contextual facts mandate a different outcome in this case.

Against this background, the language of the *Allen* charge given in this

case, though nearly identical to that approved in *Gilbert*, cannot be considered

non-coercive.  In particular, the *Allen* charge instructed the jury that "[i]f at all

possible, you should resolve any differences and come to a common conclusion

*that this case can be completed.*"  *See supra* n.17 (emphasis added).  Thus, the

*Allen* instruction suggested the case against Hooks would not be completed in the

absence of unanimity.[31]  This suggestion from the trial court itself was a perfect

_____

[31]The dissent asserts that the remainder of the trial court's *Allen* charge
dissipated any suggestion that only a unanimous verdict would bring the case to
"completion."  Dissenting Op. at 25-26.  The problem, of course, is that the
language quoted by the dissent merely admonishes jurors to adhere to their honest
convictions.  It does nothing to dispel the notion, drilled into the jurors by Miller
and Macy, that failure to reach unanimity would amount to a gross waste of
judicial resources:

> [The jury system], it's the best system in the world.  And it requires,
> though, these 12 people, these 12 strangers to come together and
> collaborate, discuss, make a decision.  The system would actually
> grind to a halt.  Think about it.  It would grind to a screeching halt if
> juries didn't come together and do that.
>      If we couldn't depend on 12 citizens to come together and go
> in the same direction, then we would never have a verdict.  There
> would never be a disposition.  Defendant[s] would go back to jail and
> wait for the next trial and they'd go back to jail and wait for the next

(continued...)

fit with Miller's and Macy's improper closing arguments strongly emphasizing that if the jury failed to reach a unanimous verdict the court's, parties', and jury's efforts would be wasted. The prosecutorial misconduct was exacerbated by the trial court's refusal to give the explanation in OUJI-CR 4-83 that in the event of deadlock, the court would impose a life sentence. *Cf. Lowenfield*, 484 U.S. at 234 (noting as part of contextual analysis that during initial penalty-phase instructions, trial court informed jury "that if it were unable to reach a unanimous recommendation, the court would impose a sentence of life imprisonment"); *Darks*, 327 F.3d at 1014 (same). This context caused an otherwise proper *Allen* instruction to heighten the risks of jury coercion.

For these same reasons, two additional *Arney* factors also weigh in support of our conclusion the *Allen* charge coerced the jury into returning death sentences. *Gilbert*, 302 F.3d at 1173 (examining, as part of *Arney* analysis, whether the *Allen* instruction was separated in time from the initial instructions and whether the instruction was given after a jury expressed it was deadlocked). Giving an *Allen* charge separate from and later than other instructions risks "having the jury give disproportionate weight to the new charge." *Id.* at 1174. Likewise, "there is an inherent danger in giving a supplemental instruction to an apparently

---

[31](...continued)
trial and no one would ever be acquitted and no one would ever be sent on to the penitentiary.

-65-

deadlocked jury." *Id.* (quotations omitted).[32]  The trial court gave the *Allen*

instruction some four or more hours after the initial penalty-phase instructions.

Although this sequence of events is likely to intensify coercion, it alone is not

enough to suggest undue coercion.  *Id.*  Here, however, the trial court's

*Allen* charge was given within approximately fifteen minutes of the jury's

disclosure of its predisposition and numerical vote, a request for removal of a

juror who refused to change her vote to conform with the majority, and the trial

court's vague response that it was powerless to remove the juror.  Most

importantly, the record indicates no impetus for the jury's communications with

the court other than Miller's and Macy's misleading assertions that lack of

unanimity was an unlawful exercise in jury nullification.  In this context, it is

appropriate to conclude these two *Arney* factors strongly indicate coercion, and

such conclusion is not inconsistent with *Gilbert*.

Finally, Oklahoma notes the jury's verdict was rendered almost four and

one-half hours after the *Allen* charge was given by the trial court.  Oklahoma

argues this fact fully supports the OCCA's conclusion that the trial court's *Allen*

---

[32]These are not per se rules.  For instance, "we have regularly approved the giving of supplemental *Allen* charges during jury deliberations."  *Gilbert*, 302 F.3d at 1174.  This court has also noted a trial court "is not required to accept the judgment of a jury that it is hopelessly deadlocked, and may require it to continue deliberating, so long as the court says nothing coercive to the jury."  *Id.* (quotation omitted).  Nevertheless, consideration of these contextual facts is necessary to resolve the ultimate question whether the trial court's *Allen* charge coerced the death sentences at issue in this case.

instruction did not coerce the jury's death sentences in this case. *See Lowenfield*, 484 U.S. at 420 (noting the jury's return of a verdict soon after the giving of an *Allen* instruction "suggests the possibility of coercion"). This assertion, however, ignores the subsequent unfolding of significant proceedings in the trial court.

At approximately 7:30 p.m. the jury sent a note to the judge inquiring about breaking for the evening. *Hooks*, 19 P.3d at 309. At that point, the jury had deliberated for approximately seven hours and thirty minutes. "Everyone realized that the jurors expected to go home, as they had during first stage deliberations," and be allowed to return in the morning to resume deliberations. *Id.* The parties, however, agreed the jury should remain sequestered until the conclusion of penalty-phase deliberations. *Id.* The trial court informed counsel it had reserved hotel rooms for the jury in case jurors desired to break for the evening and proposed informing the jurors of this fact prior to their resumption of deliberations. *Id.* Although defense counsel did not object to such a course of action in the abstract, he requested that the trial court first inquire of the jurors whether they were at an impasse. *Id.* The trial court refused. Instead, it informed the jury "motel rooms were reserved should the jurors care to break for the evening and resume deliberations the next day." *Id.* The trial court noted "jurors were free to continue deliberations into the night, but needed to decide whether to use the motel rooms by 10:30 p.m." *Id.* The trial court finished by informing the jury that until the completion "of this proceeding, I cannot release

-67-

you to go to your respective dwellings." *Id.* Finally, without admonishing the jurors not to abandon their honestly held beliefs, the trial court released the jurors for further deliberations. *Id.* at 309-10. Forty minutes later, the jury returned a verdict of death on each of the five counts.

The district court's logistical instructions concerning their further deliberations increased the pressure on the jury to reach a unanimous verdict. No matter their technical accuracy,[33] the clear import of those instructions was that the jury must to continue to deliberate, perhaps indefinitely, either through the night or the next morning after a night of sequestration. Miller and Macy, of course, had previously led the jury to believe that failure to reach a unanimous verdict would result in an enormous waste of judicial resources because the penalty phase would have to be retried. Likewise, the trial court's *Allen* charge, preceded immediately by the pointed communications between the jury and the court concerning the holdout juror, significantly amplified the impact of Miller's

---

[33]The OCCA held the trial court's statement regarding sequestration was "an accurate statement of law—the jury was sequestered and jurors could not be separated until they either reached a verdict or an impasse was declared." *Hooks*, 19 P.3d at 310. The problem, of course, was that Miller and Macy had actively misled the jury regarding the consequences of the failure to reach unanimity, misinforming the jury it must reach a unanimous sentence reflecting the majority view to prevent the waste of resources that would accompany a retrial. With that misconduct as background, the trial court then consistently refused to accurately instruct the jury that a lack of unanimity would effectively end the case and result in life sentences. Finally, the trial court's logistical instructions implied that deliberations might very well continue indefinitely.

and Macy's misconduct by asking the jury to reach unanimity "that the case could be completed." *See supra* n.17.

Against this backdrop, in response to a note from the jury indicating it would like to return home for an evening break, the trial court simply indicated the jury should continue to deliberate, at its own pace, either into the night or the next morning after being sequestered in a hotel. *Hooks*, 19 P.3d at 309. It failed to remind the jurors "not to abandon their honestly held beliefs," *id.* at 310, and did not provide any signal to the jury that it would be asked to do anything other than deliberate indefinitely until it reached unanimity. *Cf. Gilbert*, 302 F.3d at 1172, 1175 (noting potential for coercion reduced where trial court informed jury as part of *Allen* charge that it "was conscious of the hour" and "would like for [the jury] to try one more time"). Instead, the trial court told the jury that if it wanted motel rooms, it had to inform the court by 10:30 that evening. *Hooks*, 19 P.3d at 309. Thus, the trial court's logistical instructions heightened an already coercive atmosphere, resulting in the jury returning five death sentences forty minutes later. It is this forty-minute period, rather than the several-hour period following the *Allen* charge, that is the appropriate focus to measure the likelihood of coercion. In light of all that happened previously, the only reasonable conclusion is that the short time period between the trial court's discussion with the jury over sequestration and the return of the death sentences strongly indicates the death sentences in this case were coerced. *Lowenfield*, 484 U.S. at 240.

*3. The Dissent*

     *a. AEDPA Deference*

The dissent asserts this court's decision to grant Hooks habeas relief somehow labels the OCCA, the federal district court judge, and the dissenter himself as unreasonable. Dissenting Op. at 3 ("At the risk of joining the OCCA and the district court in being labeled unreasonable in the assessment of Constitutional imperatives in this case, I disagree."); *id.* at 26 ("I am not convinced the OCCA, which studiously inquired, has passed beyond the edge of reasonableness."). This assertion demonstrates a deep and fundamental misunderstanding of the AEDPA's standard of review. The Supreme Court has made it abundantly clear that AEDPA's "unreasonable application" prong calls on this court to undertake an objective assessment of the state court decision, not a subjective assessment of the views of the judges on the relevant state court (or, for that matter, the views of individual federal judges).

> There remains the task of defining what exactly qualifies as an "unreasonable application" of law under § 2254(d)(1). The Fourth Circuit held in [*Green v. French*] that a state-court decision involves an "unreasonable application of . . . clearly established Federal law" only if the state court has applied federal law "in a manner that reasonable jurists would all agree is unreasonable." [143 F.3d 865, 870 (4th Cir 1998)]. The placement of this additional overlay on the "unreasonable application" clause was erroneous. . . .
> Defining an "unreasonable application" by reference to a "reasonable jurist," however, is of little assistance to the courts that must apply § 2254(d)(1) and, in fact, may be misleading. Stated simply, a federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly

established federal law was objectively unreasonable. The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case. The "all reasonable jurists" standard would tend to mislead federal habeas courts by focusing their attention on a subjective inquiry rather than on an objective one.

*Williams v. Taylor*, 529 U.S. 362, 409-10 (2000). Thus, AEDPA mandates that this court focus only on the decision before the court on habeas review, not on whether the individual judges on the relevant state court are generally reasonable individuals.[34] Likewise, to the extent it asserts this court should deny habeas relief because it and the district court judge disagree with the outcome, the dissent again demonstrates a deep and fundamental misunderstanding of AEDPA's standard of review. The *Williams* court specifically rejected such a standard as embodying an improper subjective standard. *Id.* at 410 (rejecting Fifth Circuit's

---

[34]If that were the question, no petitioner would ever be entitled to habeas relief. This court has no doubt that the state court judges in Oklahoma, Colorado, Kansas, New Mexico, Wyoming, and Utah are eminently reasonable individuals and that each and every one of them is attempting to do justice in all cases that come before them. Nevertheless, reasonable judges make mistakes sometimes, even big, unreasonable mistakes. In those situations, the Supreme Court has not hesitated to grant habeas relief. *See, e.g.*, *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 259 (2007) (concluding Texas Court of Criminal Appeals' resolution of petitioner's claim was not a reasonable application of Supreme Court precedent); *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005) (concluding Texas state court factual finding was unreasonable); *Wiggins v. Smith*, 539 U.S. 510, 527 (2003) (holding that the "Maryland Court of Appeals' application of *Strickland*'s governing legal principles was objectively unreasonable").

standard which denied habeas relief as long as any one judge on three-judge panel was unwilling to grant habeas relief).

As noted by the Supreme Court, "[t]he term 'unreasonable' is no doubt difficult to define." *Id.* It is certainly not unusual or untoward that individual members of a panel of judges would reach different conclusions as to the whether a state court decision is an unreasonable application of clearly established federal law. That is particularly true in this difficult case. What is unusual and wrong after *Williams* is to transform the inquiry into a subjective one, differentiating jurists as "reasonable" and "unreasonable." In granting Hooks habeas relief, this court is well aware of the costs involved. *See* Dissenting Op. at 28-29 (noting difficulties Oklahoma might encounter in attempting to retry the penalty phase of Hooks's trial). We cannot, however allow that consideration to deflect this court from its duty to grant habeas relief in an appropriate case. *See supra* note 34 (collecting cases in which the Supreme Court has granted habeas relief under the highly deferential AEDPA standards of review).

### b. Merits

In asserting Hooks is not entitled to habeas relief as to his death sentences, the dissent employs a piece-by-piece analysis, arguing the individual instances of misconduct and error during the penalty phase are insufficient, standing alone, to conclude the OCCA's resolution of Hooks's jury coercion claim amounts to an unreasonable application of *Lowenfield*. Unfortunately, the dissent fails in the

end to step back and take a look at the whole. In so doing, the dissent fails to remain true to *Lowenfield*, which mandates that in resolving the question of whether a jury verdict was coerced, reviewing courts must consider the *Allen* charge "in its context and under all the circumstances." 484 U.S. at 237 (quotation omitted).

The bulk of the dissent is directed toward an effort to dilute the importance of the prosecutors' misstatements regarding jury unanimity and nullification. The dissent asserts those statements were nothing more than, at most, minor misstatements of the law. Dissenting Op. at 9-22. The OCCA certainly does not share the dissent's characterization of Miller's and Macy's conduct during penalty phase closing arguments. *Hooks*, 19 P.3d at 314 ("Prosecutors . . . engaged in egregiously improper argument which we have often condemned."); *id.* at 316 ("The closing arguments complained of here suggest jurors should in fact abandon their honestly held beliefs if those beliefs will result in a less than unanimous verdict. These misstatements of law could have deprived Hooks of his right to a properly instructed capital jury, and come close to requiring relief even if the other comments did not render the proceedings as a whole fundamentally unfair.").[35] The dissent's weak protestations to the contrary, it simply cannot be

-----

[35]In his dissent, Judge O'Brien asserts the OCCA's unanimous concerns about Miller's and Macy's misconduct were "overwrought." Dissenting Op. at 21. The irony of the dissent's assessment speaks for itself. The dissent further asserts that our reading of the prosecutors' statements is "selective." Dissenting

(continued...)

debated that the prosecutors' remarks to the jury regarding jury nullification and

the need for unanimity misinformed the jury of its proper role under Oklahoma's

death penalty scheme.  *Hooks*, 19 P.3d at 316.[36]

The dissent's failure to recognize the import of the prosecutors' misconduct

leads it to similarly minimize additional aspects of the penalty phase indicative of

[35](...continued)
Op. at 10.  It is the dissent, however, that in trying to rehabilitate the prosecutors'
clearly improper comments on jury unanimity and nullification adopts a selective
and stilted view of the record.  Miller's and Macy's improper remarks about jury
unanimity and nullification certainly do not stand alone.  *Hooks*, 19 P.3d at 315
(holding prosecutors misstated the law as applied to Oklahoma's heinous,
atrocious, or cruel aggravating circumstances and, additionally, encouraged the
jurors to decide the question on the basis or sympathy for the victims); *id.*
(holding prosecutors erroneously argued to the jury the victims were kidnaped,
thereby "dangerously skirt[ing] the border of impropriety); *id.* at 316-17 (stating
that prosecutors, in direct defiance of the directions of the OCCA, had utilized the
"infamous 'three hots and a cot'" argument and had exhorted the jury to "'pray if
you want to'").  Nor can it be debated that Miller's and Macy's misconduct was
intentional.  As detailed at length above, these prosecutors have a long and
infamous history of engaging in misconduct.  *See supra* n.25.  The OCCA itself
noted that Miller and Macy continued to make improper arguments to the jury in
direct contravention to the directions of the OCCA.  *Hooks*, 19 P.3d at 317.  A
review of the entire record in this case reveals that Miller's and Macy's
exhortations to the jury that failure to reach unanimity would amount to nothing
other than jury nullification was a plain, intentional, and ultimately successful
attempt to subvert the jury's understanding of its proper role during death penalty
deliberations.

[36]The dissent asserts that, in any event, the majority has engaged in "over
reading of Supreme Court precedent" by relying on the Supreme Court's decision
in *Romano v. Oklahoma*, 512 U.S. 1 (1994).  Dissenting Op. at 17 & n.10.  What
the dissent fails to acknowledge, however, is the Supreme Court itself has
recognized that the principles set out in *Romano* are implicated when a jury is
misled as to the consequences of deadlock.  *Jones v. United States*, 527 U.S. 373,
381-82 (1999).

coercion. For instance, the dissent asserts the jury's note requesting the removal of a juror is minimally probative because it could be related to matters other than the prosecutors' misstatements of the jury's role. Dissenting Op. at 24. The dissent engages in pure speculation in asserting there may have been benign explanations for the jury's request to remove a juror who refused to a death sentence. *Id.* As noted at length above, however, such speculation is utterly at odds with the record in this case. *See supra* at 56-57. The record reveals one, and only one, concrete basis upon which a majority of the jury could conclude it was improper for a single juror to refuse to acquiesce in a death sentence: Miller's and Macy's improper comments on jury unanimity and nullification.

Similarly, in assessing the coercive nature of the trial court's *Allen* charge in this particular case, the dissent does not even consider the timing of the charge (no more than ten minutes after the jury asked the court to remove the lone dissenting juror and immediately after a protestation of deadlock) or the fact the jury returned a verdict no more than forty minutes after it was informed it would be sequestered for the evening if it was unable to quickly return a verdict.[37] *See supra* 63-66. The failure to account for these contextual circumstances in

---

[37]Instead, the dissent asserts "[t]here is no reason to think any juror would assume deliberations would be interminable." Dissenting Op. at 26. In support of this assertion the dissent notes the jury deliberated for thirteen hours during the guilt phase but only eight during the penalty phase. *Id.* Of course, the guilt phase lasted twelve days, while the penalty phase, including opening and closing arguments, lasted no more than a couple of hours.

analyzing whether the OCCA's decision was an unreasonable application of *Lowenfield*, especially in light of the failings of the dissent identified above, seriously undermines the dissent's criticism of the decision to grant Hooks habeas relief as to his death sentences.

*4. Conclusion*

This court is precluded from issuing the writ simply because it determines in its independent judgment that the OCCA applied *Lowenfield* erroneously or incorrectly. *McLuckie*, 337 F.3d at 1197. "Rather, we must be convinced that the application was also objectively unreasonable." *Id.* This, however, is one of those rare cases where the record so clearly and unequivocally demonstrates jury coercion that the OCCA's contrary conclusion is unreasonable. *Cf. Early v. Packer*, 537 U.S. 3, 11 (2002) (per curiam) (reversing grant of habeas relief on jury coercion claim because it was reasonable to conclude on the record the jury had not been coerced).

All aspects of the penalty phase, excluding only the presentation of evidence, emphasized the concept of jury unanimity. This emphasis began with the initial penalty-phase instructions and concluded with the *Allen* charge, the incorrect instruction for a deadlocked jury in an Oklahoma capital case. Sandwiched between the initial instructions and the *Allen* charge was even more communication about jury unanimity. Miller and Macy engaged in active prosecutorial misconduct that went to the very heart of the jury's understanding

of its role at sentencing.  The obvious effect of this misconduct, as demonstrated by the jury's first note to the trial court, was that the jury believed it was unlawful to maintain an honestly held position if to do so would prevent the jury from reaching a unanimous verdict.  The trial court's *Allen* charge fifteen minutes later served to seriously exacerbate coercion by failing to inform the jury of the actual sentencing consequences of deadlock.  The *Allen* charge itself magnified the prosecutorial misconduct by reaffirming that the jury should work in earnest to reach a unanimous verdict so the case could be "completed."  Thus the jury, infected with the concept that absent unanimity a retrial would occur and troubled by its lack of unanimity, was never told the trial court would impose a life sentence in the event of deadlock.  These facts, when combined with the trial court's inartful responses to the first note from the jury and the jury's request to return home for the evening, compel the conclusion the death sentences were coerced and require relief under *Lowenfield*.  This is especially true given the heightened entitlement of a defendant facing the death penalty to an uncoerced verdict of the jury.  *Lowenfield*, 484 U.S. at 241; *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (holding a federal habeas court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case" (quotation omitted)).  Failure to grant relief on this record would amount to nothing more than "abject deference" to the decision of the OCCA, something to

which no state court is entitled under AEDPA.  *Snow*, 474 F.3d at 696 (quotation omitted).

## VI.  CONCLUSION

The district court's denial of habeas relief on the five murder convictions is **AFFIRMED**.  That part of the district court's order denying habeas relief on the five death sentences is, however, **REVERSED**.  The matter is **REMANDED** to the district court for the issuance of an order consistent with this opinion.

07-6152, *Hooks v. Workman*
**O'BRIEN**, J., concurring and dissenting.

After a twelve day trial and thirteen hours of deliberation, an Oklahoma jury convicted Danny Hooks of five counts of first degree murder for the brutal slayings of five women. After a one day sentencing hearing and approximately eight hours of deliberation, the jury sentenced him to death on each count. After a thorough review of the trial record and the record of state post conviction proceedings the Oklahoma Court of Criminal Appeals (OCCA) unanimously affirmed the convictions and death sentences. After careful consideration of the record, the federal district court denied habeas relief. I join the majority opinion in denying habeas relief on the guilt phase issues, but respectfully dissent from its conclusion that the five death sentences were constitutionally infirm.

The majority opinion is studious and thorough. It convincingly demonstrates that the OCCA may have erred in considering the ultimate issue, whether the jury's verdict was coerced. Were this case here on direct review I could comfortably join. But it is not.

The decisions of the OCCA are entitled to substantial deference. The Supreme Court has made that abundantly clear, particularly of late, by repeatedly reversing courts of appeals for over-reading its precedents. Substantial deference does not mean abject deference; I fully understand. Such labeling may have emotional appeal, but it does not inform the

debate. The touchstone of habeas review in this case is the reasonableness of the OCCA's decisions. That is my focal point; I have neither said nor implied that the general reasonableness (or reputation) of any judge or court is in play. And my purpose is not to "rehabilitate" the prosecutors. The OCCA has clearly said the prosecutors' arguments were out of bounds and amounted to prosecutorial misconduct. But it also unanimously held, correctly in my view, that their remarks did not so poison the well so as to deny Hooks a fair sentencing hearing. The majority studiously avoids saying the OCCA unreasonably applied federal law in so concluding, but then it goes to great length in accusing the prosecutors of sowing the devil's seed and reaping the harvest of one lost soul. On that narrow point, if Supreme Court precedent is being unreasonably applied it comes from the hand of the majority, not the OCCA.

The majority identifies no violation of federal law in the instruction to the jury, initially or during deliberations, and the trial judge's possible mismanagement of the jury may deserve criticism but is not, by itself, a basis for habeas relief. Unless prosecutorial misconduct clearly and irretrievably mislead jurors and infected the jury's deliberations the majority's reason for affording habeas relief fails, even under its accumulation theory; not because it is wrong but because, in a broad view of the facts, the OCCA's contrary conclusion (no jury coercion) is not unreasonable.

While acknowledging deference is due to state judicial decisions the majority says "The deference accorded [the OCCA] decision . . . is not abject, and the record in this case so overwhelmingly demonstrates the jury's death sentences were coerced that the OCCA's contrary decision is not just wrong, it is unreasonable. *See Snow*, 474 F.3d at 696 (noting that despite § 2254(d)'s high standard, it does not require 'abject deference' on the part of this court, . . .)" Majority Op. at 50-51. After listing the events it views as "an ever-rising tide of coercion" it concludes "the record in this case so indicates jury coercion that it was an unreasonable application of *Lowenfield* [*v. Phelps*, 484 U.S. 231 (2008)] for the OCCA to deny Hooks relief." *Id*. at 52. Strong stuff. At the risk of joining the OCCA and the district court in being labeled unreasonable in the assessment of Constitutional imperatives in this case, I disagree.

**I.**

I start by charting our limited role in habeas cases, such as this. My understanding of it apparently differs, at least in application, from that of the majority. The Supreme Court has explained how the sails should be trimmed:

> Th[e] question is not wh[at] the trial judge should have [done.] It is not even whether it was an abuse of discretion for her to have done so -- the applicable standard on direct review. The question under AEDPA is instead whether the determination of the [State] Supreme Court . . . was "an unreasonable application of ... clearly established Federal law." §2254(d)(1).

We have explained that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Rather, that application must be "objectively unreasonable." This distinction creates "a substantially higher threshold" for obtaining relief than de novo review. AEDPA thus imposes a "highly deferential standard for evaluating state-court rulings," and "demands that state-court decisions be given the benefit of the doubt."

*Renico v. Lett*, --- S. Ct. ---, No. 09-338, 2010 WL 1740525, at *5 (May 3, 2010) (citations omitted).

It has repeatedly emphasized that in implementing the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) a federal court may disturb a state-court ruling only when the law being applied is "clearly established" and the application of that "clearly established" law is unreasonable.[1] "[The] Court has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419 (2009) (quotations omitted); *see also Wright v. Van Patten,* 552 U.S. 120, 126 (2008) (*per curiam*) ("Because our cases give no clear answer to the

---

[1] The phrase "clearly established Federal law, as determined by the Supreme Court of the United States . . . refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

- 4 -

question presented, . . . it cannot be said that the state court unreasonably applied clearly established Federal law.") (quotations and alterations omitted); *Schriro v. Landrigan,* 550 U.S. 465, 478 (2007) (Supreme Court had never addressed "a situation in which a client interferes with counsel's efforts to present mitigating evidence . . . ."); *Carey v. Musladin,* 549 U.S. 70, 76 (2006) ("This Court has never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial."): *Early v. Packer*, 537 U.S. 3, 11 (2002) ("Even if we agreed with the Ninth Circuit majority . . . that there was jury coercion here, it is at least reasonable to conclude that there was not, which means that the state court's determination to that effect must stand.").

In *Mirzayance*, the Court reviewed the Ninth Circuit's conclusion that, to be of effective assistance to a capital defendant, counsel must pursue what he reasonably believes to be a futile defense because there was nothing to lose by doing so. Bewildered by such an expansive reading of *Strickland,* the Supreme Court reversed, saying: "This Court has never established anything akin to the Court of Appeals' 'nothing to lose' standard for evaluating *Strickland* claims." *Mirzayance*, 129 S. Ct. at 1419. *Mirzayance* thus punctuates the key requirement of the AEDPA, 28 U.S.C. § 2254(d)(1) — a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision "was contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* at 1418 (quotations omitted).

The rigor of that requirement was reinforced again this term in *Berghuis v. Smith*, -- U.S. --, 130 S. Ct. 1382, 1392 (2010) ("[O]ur *Duren* decision hardly establishes - no less 'clearly' so - that Smith was denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community.")[2] and in *Thaler v. Haynes*, -- U.S. --, 130 S. Ct. 1171, 1175 (2010) ("Accordingly, we hold that no decision of this Court clearly establishes the categorical rule on which the Court of Appeals appears to have relied, and we therefore reverse . . . .").[3] Our

---

[2] In *Berghuis*, the Court reversed the Sixth Circuit's determination that the Michigan Supreme Court had unreasonably applied *Duren v. Missouri*, 439 U.S. 357 (1979), when it rejected the defendant's argument that African-Americans had been systematically excluded from the jury pool. The Court stated: "As the Michigan Supreme Court correctly observed, . . . neither *Duren* nor any other decision of this Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools." *Berghuis*, 130 S. Ct. at 1393. Because the Michigan court's ruling that Smith had failed to prove a systematic exclusion was not unreasonable, "the Sixth Circuit had no warrant to disturb it." *Id.* at 1388.

[3] In *Thaler*, "the question [was] whether any decision of th[e] Court 'clearly establishes' that a judge, in ruling on an objection to a peremptory challenge under *Batson v. Kentucky,* . . . must reject a demeanor-based explanation for the challenge unless the judge personally observed and recalls the aspect of the prospective juror's demeanor on which the explanation is based." 130 S. Ct. at 1172 (citation omitted). "*Batson* requires a judge ruling on an objection to a peremptory challenge to

task is to first look for "a specific legal rule" that has been "squarely established" by the Supreme Court. *Mirzayance*, 129 S. Ct. at 1419. The majority says *Lowenfield* established such a rule. Let's see.

*Lowenfield* claimed the trial court violated his Constitutional rights by giving an "*Allen*" jury charge and polling the jury. The Supreme Court said:

> We hold that on these facts the combination of the polling of the jury and the supplemental instruction was not "coercive" in such a way as to deny petitioner any constitutional right. By so holding we do not mean to be understood as saying other combinations of supplemental charges and polling might not require a different conclusion. Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body.

*Lowenfield*, 484 U.S. at 241. The majority seizes on the last sentence as the yardstick by which the OCCA's treatment of this case must be measured. But an entitlement to an "uncoerced verdict" is hardly a specific legal rule. The sentence is so general as to offer no guidance beyond the specific holding dictated by the facts of that case — jury

---

undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. . . . This general requirement however, . . . did not clearly establish the rule on which the Court of Appeals' decision rests." *Id*. at 1174 (quotation and citation omitted). *Batson* noted the need for a judge ruling on an objection to a peremptory challenge to "tak[e] into account all possible explanatory factors in the particular case." *Batson v. Ky.*, 476 U.S. 79, 95 (1986) (quotation omitted). But *Batson* plainly did not go further and hold that a demeanor-based explanation must be rejected if the judge did not observe or cannot recall the juror's demeanor. *Id*.

polling and an *Allen* charge in that case did not amount to coercion.[4]  As to

what *does* constitute jury coercion, *Lowenfield* is no more revealing than

saying a defendant is entitled to effective assistance of counsel.  *Strickland*

*v. Washington*, 466 U.S. 668 (1984).  But unlike *Strickland* and it's

progeny, which at least provide guidance for its application,[5] *Lowenfield*,

establishes nothing more than a general (perhaps merely aspirational)

principle without a hint as to how courts are to determine whether a

Constitutional violation occurred.  When such a general standard is

---

[4]  The facts in *Lowenfield* are, admittedly, less unsettling than these, but nothing in that decision suggests its unique facts establish a floor for future reasonableness determinations, as the majority implies.

[5]  A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

 *Strickland*, 466 U.S. at 687.  And "it is the responsibility of the courts to determine the nature of the work that a defense attorney must do in a capital case in order to meet the obligations imposed by the Constitution." *Bobby v. Van Hook*, 130 S. Ct. 13, 20 (2009) (J. Alito concurring) ("I see no reason why the ABA Guidelines should be given a privileged position in making that determination.").

involved, as in *Strickland* analysis, "a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Mirzayance*, 129 S. Ct. at 1420; *see also Lett,* 2010 WL 1740525 at \*5 ("This type of general standard triggers another consideration under AEDPA . . . the nature of the relevant rule that the state court must apply.") (quotations omitted)*; Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."). Our review of the OCCA's decision in this case should be "doubly deferential," *Mirzayance*, 129 S. Ct. at 1420, since no *specific* violation of the U.S. Constitution is identified.

## II.

The keystone of the majority's cascading-errors-inescapably-lead-to-coercion analysis[6] is the prosecutors' "misstatements of law." And the label course[7] consists of a series of suppositions — 1) the jury was actually

---

[6] Such an approach avoids cumulative error analysis wherein specific errors of Constitutional dimension are first identified and the cumulative effect of those identified errors are then considered (factors not amounting to error are excluded from the analysis). *See United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir.1990) (en banc) ("a cumulative-error analysis aggregates only actual errors to determine their cumulative effect.").

[7] The course of bricks forming an arch and tying into the keystone. *See* http://www.gobrick.com/BIA/technotes/t31.htm (last visited May 11,

misled about the need for unanimity in applying mitigating facts to the ultimate decision (even though the jury instructions were abundantly clear and correct on the point), 2) the jury's ambiguous note to the court necessarily exposed juror confusion, and 3) there is a clear cause and effect relationship between the actions of the prosecutors and the presumed jury confusion. According to this theory, because the jury's possible misunderstanding went uncorrected during the jury deliberation process, the verdict was coerced. The OCCA saw it differently.

To decide whether the OCCA's decision to the contrary is "objectively unreasonable," or even wrong, we must take a close look at the events, especially the prosecutors' arguments, in context. The majority does so selectively, and thus fails to provide necessary context. It decries Prosecutor Miller's remarks, that it is not easy "asking 12 strangers that don't know each other to come into the room here and listen to all of this and end up with unanimity going in the same direction." Majority Op. at 34. But at that point, Miller was recalling for the jurors their *guilt phase* deliberations and urging them to continue the deliberative process in the same spirit. Because the closing arguments are critical to the majority's coercion theory, a more complete airing is necessary. Miller said:

Because you all play a role in this. It's a deliberative process.

2010).

- 10 -

That's why we have 12.  That's why we ask you to deliberate.
Because it allows the world, a rational thinking world anyway
to know with great certainty that at least within our human
capabilities everything has been done and everything has been
talked about to come to a fair conclusion.  Fair to everyone.
*And that's what you all did.*

Now it is no easy task and we all recognize it.  It is certainly
nothing easy about asking 12 strangers that don't know each
other to come into the room here and listen to all of this and
end up with unanimity going in the same direction.  It's a
tremendously difficult process and we know that.

But again, it's the best system in the world.  And it requires,
though, these 12 people, these 12 strangers to come together
and collaborate, discuss, make a decision.  The system would
actually grind to a halt.  Think about it.  It would grind to a
screeching halt if juries didn't come together and do that.

If we couldn't depend on 12 citizens to come together and go in
the same direction, then we would never have a verdict.  There
would never be a disposition.  Defendant's [sic] would go back
to jail and wait for the next trial and they'd go back to jail and
wait for the next trial and no one would ever be acquitted and
no one would ever be sent on to the penitentiary.

So what you went through the last few days is exactly what
everyone that sits in the chairs goes through, and fortunately,
by far and away, the great majority come to a decision that we
all can live with and justice can be done now that is your role.
That's what we want you to do.

As you each agreed in voir dire, every single one of you would
not be sitting here unless *you agreed in unanimity that the
defendant was guilty* then each of you said you would fully and
fairly consider all three possible punishments not to the
exclusion of any but all three.  *Now is that time.*

But you can't even do that yet.  You couldn't even do that
because there are so many systems within this system to make
sure the defendant is protected.  You couldn't even do all three
unless the state could first prove that at least one of the
statutory aggravators existed.  There are eight of them and
we've alleged six.

(Tr. of Proceedings, Stage II, Vol. IX at 2021-22) (emphasis added).)

He then started talking about the six aggravating factors the state had alleged (the instructions clearly informed the jurors that the state was obligated to prove each aggravator beyond a reasonable doubt to their unanimous satisfaction). Miller claimed the state had proved all six aggravators and started detailing the proofs. As he got to the fourth aggravator he digressed to speak of the time and effort the state spent to insure a fair trial for Hooks and contrasted Hooks's unceremonious execution of the victims. He commented about how we afford such rights to criminal defendants because it is the law. He then made the jury nullification remarks condemned by the majority.

> Now I suggest that Mr. Box will probably say something to the affect that someone on this jury could hold up a decision. He will likely tell you that it just takes one person to stop all this. That is such a common argument down here that it's got a name. It's called jury nullification.
>
> Nullification means an action impeding or attempting to prevent the operation or enforcement of the law. Websters. Nullification means an action impeding or attempting to prevent the operation of the law.
>
> In other words, to nullify a jury, a jury's job, a jury's efforts really requires only convincing one or two people to cripple it, to stop it. And while I don't want to beat this down I have got to tell you one more time that that's not what we're about. This system, and I remind you, is about deliberation. To do otherwise eviscerates the system. It cuts it up literally. It cuts it up. The very law that we live by. The 12 of you must resolve this case, all 12, I suggest.
>
> Now you worked through in stage one and I asked you to all,

every one of you give it equal vigor. Give it more vigor, if necessary, to work through it now. Decide what's appropriate for him.

(*Id*. at 2028.) Immediately after those words he discussed the fifth aggravator (committing these crimes while being a parole absconder) and then moved on to the continuing threat aggravator. His statements regarding "jury nullification"[8] were made in the middle of and, to my lights, in connection with his argument about proving aggravators. It seems he was arguing that no juror should ignore the obligation to deliberate with respect to aggravating factors because unanimity was required as to each before it could be considered in the ultimate calculus. And with respect to finding aggravators, individual jurors do not have the same latitude to "vote their conscience" irrespective of the facts as they do in ultimately deciding whether the death sentence is appropriate.

After going through each aggravator Miller turned to a discussion of mitigating factors. Significantly he made no mention of jury nullification while speaking about mitigating factors. He suggested the claimed

---

[8] Miller's statements about jury nullification were improvident, unnecessary (because of strength of the state's case), and unfortunate — a circumstance clearly addressed by the OCCA. But in the context of arguing that the jury should (unanimously) find the aggravating factors to be proved (beyond a reasonable doubt) I don't see them as prejudicing Hooks, particularly not to the extent that he was deprived of a fair trial. The OCCA saw it the same way. Was the OCCA wrong? Maybe. Unreasonable? Hardly.

mitigating factors did not amount to much but he did not misrepresent the law as to how the jury, or individual jurors, should ultimately use them.

Analyzing whether prejudice sufficient to "render petitioner's trial unfair" is evident on the record, a totality of the circumstances approach is necessary. *Darden v. Wainwright*, 477 U.S. 168, 183 n.15 (1986). There was no objection to the prosecutors' remarks and defense counsel's rebuttal was more than "simply noting for the jury that the defense 'will ask and tell [the jury] that it only takes one' because 'that happens to be the law in Oklahoma.'" Majority Op. at 35. Defense counsel stated:

> All of you told me you could be your own person and that you could stay with what you thought was right, if you thought it was right. And evidently during the [guilt] deliberation there was some that had differences of opinions and those persons changed.
>
> As we go into this stage of the trial, as the state said earlier, that we will ask and tell you that it only takes one. Well, the reason we tell you that is that happens to be the law in Oklahoma.
>
> If one of you --- now you don't all have to reach a unanimous verdict in this case so don't be misled and think that. You do not have to do that. You do not.
>
> If you --- one of you believes the appropriate penalty – and each of you told me when we asked you to start with that you do believe in a case where there were five deaths that you could consider, legitimately consider all three penalties.
>
> At this point and time when you go back to deliberate this case you all don't have to decide. The state said you all have to make a decision. You all have to decide. You don't have to do that.
>
> If one of you, two of you or more of you believes that the

- 14 -

penalty should be less, one penalty or the other, you must stay with that position. And when you return your verdict you do not have to say you are all unanimous or you will be here for the rest of your days or hours. One person can say I do not want death, two, any number can and there's not a death penalty.

(Tr. of Proceedings, Stage II, Vol. IX at 2037-38.) Defense counsel clearly informed the jury a unanimous verdict was needed only to *impose* the death penalty, as the court's instructions clearly provided.[9]

A totality of circumstances analysis must also include both the prosecutors' and defense counsel's reference to voir dire in closing arguments. The jury's contemplation of its role at the penalty phase was discussed well before the closing arguments at sentencing. The jury voir

---

[9] Generally, "arguments of counsel . . . carry less weight with a jury than do instructions from the court." *Waddington v. Sarausad*, 129 S. Ct. 823, 827 (2009). Instruction No. 14 stated: "In the event you assess the death penalty, your verdict *must* be unanimous. You *may* also return a unanimous verdict of imprisonment for life without the possibility of parole or imprisonment for life with the possibility of parole." (R. Vol. II at 299 (emphasis added).) Instruction 8 told the jury "Should you unanimously find that one or more aggravating circumstances existed beyond a reasonable doubt, you are *authorized to consider* imposing a sentence of death. If you do not unanimously find beyond a reasonable doubt that one or more of the aggravating circumstances existed, you are prohibited from considering the penalty of death." (*Id.* at 291 (emphasis added).) Instruction 11 informed the jury: "If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the death penalty shall not be imposed unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances. Even if you find that the aggravating circumstances outweigh the mitigating circumstances, you may impose a sentence of imprisonment for life with the possibility of parole or imprisonment for life without the possibility of parole." (*Id.* at 295.)

dire contained significant discussions of the jurors' responsibility to consider all three sentencing options — death, life without the possibility of parole and life with the possibility of parole.

After the defendant's closing argument, Prosecutor Macy addressed the jury. He spent some time discussing the gruesome facts of the multiple murders, some of the sentencing aggravators, and Hooks's lifestyle. He then remarked on the irony of Hooks asking for mercy when he showed none to his victims. He spoke of the difficult job the jury did during the guilt phase and then said:

> We know that you're getting ready to face the toughest part of your job in just a few minutes. Mr. Box mentioned that any one of you can control the result in this trial *and you can do that legally*. But ladies and gentlemen, there is not one chair up there. There's 12. Twelve chairs. And there's 12 chairs for that purpose. The Constitution of the United States guarantees a person a trial by a jury of his peers, not by one person, by a jury of his peers. There's been far too much work gone into this case. It's far too important in this case for someone to play martyr and try to hang it up.

(*Id.* at 2057-58 (emphasis added).)

Nothing more was said about a single juror possibly thwarting the will of other jurors. Prosecutor Macy went on to discuss "the two lives of Danny Hooks." (*Id.* at 2058.) He referred to the testimony about his family and upbringing and contrasted it with his other life – his drug and alcohol abuse, his sexual proclivities, his prior kidnapping and rape conviction, these violent murders and his lack of remorse. There was no

- 16 -

mention of jury nullification and no further mention of what was required

to obtain or avoid the death penalty. Macy's acknowledgement that a lone

juror can prevent the death penalty, but should not on the facts of this case,

cannot be so prejudicial as to render the sentencing fundamentally unfair.

The OCCA so concluded. I agree.

One could put a more sinister spin on the prosecutors' words, as the

majority does. The majority may be wrong in its darker musings, but it is

not unreasonable. The converse is also true. The OCCA may have been

wrong in assessing the prejudicial effect of what it determined to be

prosecutorial misconduct, but not even the majority claims its decision

incorrectly or unreasonably applied Supreme Court precedent. *See Darden*,

477 U.S. at 180 ("The relevant question is whether the prosecutors'

comments 'so infected the trial with unfairness as to make the resulting

conviction a denial of due process.'") (quoting *Donnelly v. DeChristoforo*,

416 U.S. 637, 643 (1974)). And it cannot be an unreasonable application

of *Lowenfield's* extremely general statement.[10] Deference is due the

---

[10] The majority relies upon a phrase in *Romano v. Oklahoma*, "the
jury must not be misled regarding the role it plays in the sentencing
decision." 512 U.S. 1, 8 (1994). That reference is puzzling in that
*Romano* held only that the admission of a prior death sentence did not
deprive Romano of a fair sentencing proceeding. *Id*. at 12-13. Over
reading Supreme Court precedent is precisely the reason the Supreme Court
reversed in *Lett*, *Berghuis*, *Thaler*, *Mirzayance*, *Van Patten, Alvarado*,
*Landrigan, Carey* and *Early*.

OCCA's decision irrespective of whether it has articulated its reasons to our satisfaction.[11] We are not here to grade its papers, but to assess the

---

*Romano* did, however, summarize how the Supreme Court viewed *Caldwell v. Mississippi*, 472 U.S. 320 (1985), saying:

> The prosecutor in *Caldwell*, in remarks which "were quite focused, unambiguous, and strong," misled the jury to believe that the responsibility for sentencing the defendant lay elsewhere. *Id*., at 340, 105 S. Ct., at 2645. The trial judge "not only failed to correct the prosecutor's remarks, but in fact openly agreed with them." *Id*., at 339, 105 S. Ct., at 2645.
>
> The plurality concluded that the prosecutor's remarks, along with the trial judge's affirmation, impermissibly "minimize[d] the jury's sense of responsibility for determining the appropriateness of death." *Id*., at 341, 105 S. Ct., at 2646.
>
> [W]e have since read *Caldwell* as "relevant only to certain types of comment - those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright,* 477 U.S. 168, 184, n.15, 106 S. Ct. 2464, 2473, n.15, 91 L.Ed.2d 144 (1986). Thus, "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams,* 489 U.S. 401, 407, 109 S. Ct. 1211, 1215, 103 L.Ed.2d 435 (1989); see also *Sawyer v. Smith,* 497 U.S. 227, 233, 110 S. Ct. 2822, 2826-2827, 111 L.Ed.2d 193 (1990).

*Id*. at 8-9.

[11] "Avoiding these pitfalls [decisions contradicting governing law announced by the Supreme Court or arriving at a result different from Supreme Court precedent on materially indistinguishable facts] does not require citation of our cases -- indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8 (emphasis in original).

results of its efforts as directed by the AEDPA.

To set up the straw man it purports to topple, the majority uses snippets from the OCCA opinion, saying, for instance: "Thus, it seems apparent Miller's and Macy's misconduct invaded Hooks's Eighth Amendment rights by suggesting 'jurors should in fact abandon their honestly held beliefs if those beliefs will result in a less than unanimous verdict.'" Majority Op. at 58 (quoting *Hooks v. Okla.*, 19 P.3d 294, 316 (Okla. Crim. App. 2001)). The entire quote is as follows:

> The closing arguments complained of here suggest jurors should in fact abandon their honestly held beliefs if those beliefs will result in a less than unanimous verdict. These misstatements of law could have deprived Hooks of his right to a properly instructed capital jury, and come close to requiring relief even if the other comments did not render the proceedings as a whole fundamentally unfair. We note, however, that despite these erroneous arguments the jury was deadlocked for several hours. *We must conclude that the jurors in this case were not misled.*

*Hooks*, 19 P.3d at 316 (emphasis added).[12]

The expanded quote highlights the fact that the OCCA did not shy

---

[12] The majority discounts the OCCA's consideration of the time spent in deliberations stating "[t]he record simply reveals that one single juror was unconvinced, at least for a period of time . . ." Majority Op. at 59. It then speculates that "the passage of time does not rule out the possibility that other jurors also favored a life sentence, but acquiesced in a death sentence because they believed holding out would amount to, in the words of Miller, 'impeding or attempting to prevent the operation or enforcement of the law.'" *Id*. at 59-60. This type of conjecture has no place in our deferential review under the AEDPA.

away from what it considered the seriousness of the prosecutorial misconduct or its effect.[13]  The OCCA majority opinion concluded:

> These missteps are particularly unnecessary here, where the evidence amply supported the State's case and the jury verdicts.  This Court has in the past warned prosecutors against misconduct that can endanger a case.  However, we do not find these errors entitle Hooks to relief.

*Hooks*, 19 P.3d at 314.[14]  The OCCA went on to say: "In summary,

---

[13]  As the majority acknowledges, the OCCA identified the specific misstatements and discussed the seriousness of the prosecutors' misconduct.  However, as the majority also acknowledges, prosecutorial misconduct does not compel a finding of coercion.

> Improper prosecutorial argument will only warrant federal habeas relief if it renders a petitioner's trial or sentencing fundamentally unfair.  To establish that a prosecutor's remarks were so inflammatory that they prejudiced substantial rights, a petitioner must overcome a high threshold: he or she must demonstrate either persistent and pronounced misconduct or that the evidence was so insubstantial that absent the remarks, the jury would not have imposed the death penalty.

*Short v. Sirmons*, 472 F.3d 1177, 1195 (10th Cir. 2006) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974), and *Berger v. United States*, 295 U.S. 78, 89 (1935)).

[14]  The majority opinion was written by Judge Chapel and joined by Judges Strubhar and Johnson.  In a footnote, apparently joined by no other judge, Judge Chapel expressed a personal opinion that prosecutorial misconduct infected the sentencing, entitling Hooks to relief.  He was also concerned that official judicial condemnation of the practices of that office had failed to arrest offending conduct and, in part, reversal was necessary to send an effective message.  He concluded by saying:  "While I would remand the case for resentencing *as a sanction for deliberate prosecutorial misconduct*, my colleagues disagree.  I yield to them on this issue." *Hooks*, 19 P.3 at 314, n.51 (emphasis added).  I am not sure what to make of the footnote, it does not appear to be a dissent.  But one thing is clear — the two concurring judges clearly and expressly said it was inappropriate

- 20 -

prosecutors skirted the border of impropriety or engaged in outright improper argument in both first and second stage. However, after a thorough review of the entire record we conclude the prosecutorial misconduct did not affect Hooks's rights, and does not require relief." *Id.* at 317. In a concurring opinion Judge Lumpkin, joined by Judge Lile, also addressed the attorney misconduct issue, saying:

> I agree that failure of a prosecutor to adhere to rulings of this Court in the scope and type of closing argument as has been discussed and ruled upon in the opinions of this Court is a breach of professional conduct. If this Court, or members of the Court, believe a [sic] "egregious" breach of duty has been performed by an attorney then it is incumbent on us to refer the matter for proper bar discipline. While I find some of the argument inappropriate and unwarranted, I cannot find any error which would require relief in this case.

*Id*. at 322.

On several occasions in the majority and concurring opinions the OCCA expressed serious concerns with the prosecutors' arguments and its consideration of their conduct. A careful reading of the transcript suggests the majority may have been overwrought with the prosecutors' remarks. Nonetheless, the OCCA prudently resisted the temptation to reverse as a sanction for their misconduct. Considering the arguments and instructions

to impose a reversal and retrial as a *sanction* on prosecutors. Those judges properly restricted their analysis to possible prejudicial affect. Apparently the other judges in the majority at least implicitly adhered to that more circumspect reasoning as the court clearly held the misconduct did not prejudice Hooks's trial rights.

it concluded the jurors "were not misled" and "the prosecutorial misconduct did not affect Hooks's rights, and does not require relief." *Id.* at 316, 317. If we accord AEDPA deference to the OCCA we cannot conclude its determination was an objectively unreasonable application of federal law. In any event, while the prosecutors' remarks were erroneous, they were not, fairly regarded, an invidious part of "an ever-rising tide of coercion," as the majority claims. Majority Op. at 51.

## III.

The next (chronological) issue has to do with the jury note. The OCCA described Hooks argument on direct appeal:

> Hooks claims the trial court erred in failing to provide guidance to the jury in response to a question which indicated a clear misunderstanding of the law. During second-stage deliberations the jury sent out a note complaining that the holdout juror, refusing to change her vote, "refers on grounds not related to the law." Hooks claims this phrase indicates the jury misunderstood Oklahoma law by believing that the law might require a death sentence, and argues the trial court erred in failing to correct this misunderstanding. Hooks suggests the trial court should have emphasized that the law never requires a jury to impose the death penalty.[15]

*Hooks*, 19 P.3d at 312. The OCCA said it "is troubled by the suggestion that the jury believed Oklahoma law required imposition of the death penalty. However, such an interpretation is pure speculation." *Id.* It

---

[15] The manner in which the note was handled is also part of Hooks's more general complaint about juror coercion.

- 22 -

reviewed the jury instructions and concluded there was no error as the jury was accurately advised of the law, specifically that it could impose a life sentence even if it found one or more aggravating circumstances outweighed mitigating circumstances.

The majority does not specifically address the issue as framed by the OCCA. Instead it redirects the inquiry, saying, "It is clear the prosecutors' misconduct achieved its intended purpose: the jury was misled to believe it was the obligation of a juror holding a minority opinion to abandon that opinion if it was necessary for the jury to reach a unanimous sentence." Majority Op. at 61-62.[16] That is certainly an inference one could draw

---

[16] The majority faults the OCCA for failing to consider the "refers on grounds not relevant to the law" note in determining that the prosecutors' statements did not mislead the jury, Majority Op. at 60-61, n.28, and concludes the note can be read but one way. *Id*. at 60. But, the OCCA did discuss the note. *Hooks*, 19 P. 3d at 312. The fact that it did not specifically mention it in its discussion of prosecutorial misconduct is insignificant. The Supreme Court dealt with a similar argument in *Early v. Packer* (reversing the Ninth Circuit):

> The contention that the [state] court "failed to consider" facts and circumstances that it had taken the trouble to recite strains credulity. The Ninth Circuit may be of the view that the Court of Appeal did not give certain facts and circumstances adequate weight (and hence adequate discussion); but to say that it did not consider them is an exaggeration . . . . Compliance with *Lowenfield v. Phelps*, does not demand a formulary statement that the trial court's actions and inactions were noncoercive "individually and cumulatively." It suffices that that was the fair import of the Court of Appeal's opinion.

537 U.S. at 9.

from the enigmatic note and circumstances surrounding it. But its inference is not necessitated by the language of the note or the record. Other explanations are certainly not beyond the pale — the juror may have engaged in fanciful speculation about facts not in evidence or sought to base a decision on the character of the victims, perhaps by refusing to consider the death penalty because the victims were "crack heads." We can't know for sure what motivated the note, but speculation cannot inform the debate, whether it is mine or the majority's. Certainly the note is part of the overall prejudice calculus — the OCCA assigned it little or no weight because its meaning was speculative; the majority assigns it great weight. One may be right and the other wrong, but that does not make either unreasonable.

As the OCCA noted, none of the jury instructions, either at the guilt or penalty phase, misstated the law. Ten minutes after its first note, the jury informed the court it could not *unanimously* impose a death penalty — reflecting a correct understanding of the law. And that brings us to the *Allen* issues.

## IV.

As the majority acknowledges, an *Allen* charge is an acceptable method of encouraging juries to reach a difficult decision. But the issues surrounding the giving of an *Allen* instruction in this case are somewhat unique. The trial judge at first refused to give any *Allen* instruction

- 24 -

because the jury had not deliberated for sufficient time. While it might have been better to have given the instruction requested by defense counsel, refusing to do so, particularly in the early stages of deliberation, does not appear to be contrary to federal law. *See Jones v. United States*, 527 U.S. 373, 381-82 (1999). Best practices cannot translate into constitutional imperatives.

The *Allen* charge ultimately to be given is an issue of state law. The OCCA recognized the *Allen* instruction ultimately given in this case should have been tailored to the death penalty, but it also specifically held that the instruction given was not a misstatement of Oklahoma law — "[t]he trial court gave the correct *Allen* instruction." *Hooks*, 19 P.3d at 312.

The majority concludes the *Allen* instruction finally given was coercive because it "suggested the case against Hooks would not be *completed* in the absence of unanimity." Majority Op. at 68 (emphasis added). However, the majority ignores the plain language of the instruction:

> This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinions of other jurors or because of *the importance of arriving at a decision*. No juror should ever agree to a verdict that is contrary to the law *in the court's instructions*, nor find a fact or concur in a verdict which in good conscience he or she believes to be untrue.

State Court Record at 300 (emphasis added). As noted by the OCCA, this

is the last instruction the jury received and it ties to the other instructions clearly telling the jury unanimity is required only to impose the death penalty, not to avoid it, and a death sentence need not be imposed even if the aggravating factors outweigh the mitigating factors. *See* n.9, *supra*.

There is no reason to think any juror would assume deliberations would be interminable and the trial court is not required to tell them the effect of their failure to agree. *Jones*, 527 U.S. at 381. This jury deliberated for thirteen hours in the guilt phase, but only eight in the penalty phase. A trial judge may have an obligation to end deliberations at some point and impose a life sentence. But, jurors are made of pretty stern stuff and the trial judge is in the best position to assess whether the process has overburdened any of them. *See Lett*, 2010 WL 1740525 at *6 ("the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." (quotations omitted)). And state appellate courts are well able to correct abuses. Absent specific guidance from the Supreme Court, which Hooks has not identified, such decisions ought not to be micromanaged by federal courts.

## V.

I am not convinced the OCCA's decisions, which studiously inquired into each error alleged by Hooks, passed the edge of reasonableness. The

instructions contained no legal error. Prosecutor Miller's erroneous closing arguments were temporally related to his discussion of aggravating factors. They were followed by defense counsel's rebuttal emphasizing that the death penalty could not be imposed if any juror thought it inappropriate even if the aggravating factors outweighed the mitigating factors. Prosecutor Macy's argument acknowledged the law as stated by defense counsel (single juror death penalty veto) but argued it should not be done in this case. He did not mention jury nullification. The presiding juror's note requesting removal of another juror contains little insight as to its meaning and shortly thereafter the jury sent a note correctly stating the law — it could not reach a unanimous decision on imposing the death penalty. The jury then received a proper *Allen* charge reminding all jurors not to surrender honest convictions to the will of the majority. The only other communication with the jury concerned the logistics of sequestration.

In sum, the OCCA identified trial errors relating to Oklahoma law. It also identified and employed the proper federal law for assessing the impact of those errors of state law — whether, taken as a whole, the errors denied Hooks a fair sentencing hearing. At the end of the day it decided the errors, alone or in combination, did not entitle Hooks to relief. The OCCA also identified and applied the general *Lowenfield* requirement that a defendant is entitled to an uncoerced jury decision. It concluded the sentencing jury was not coerced. I am not sure it was correct in that

- 27 -

assessment but I join the district court in concluding its decision was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, especially if its decision is afforded proper deference. It was not unreasonable for the OCCA to conclude the horrific facts of this case (multiple murders by a previously convicted kidnapper/rapist), rather than a possible misunderstanding of the law or the stresses of jury service, motivated the jury to recommend five death sentences.

We have an interesting circumstance here. If the opinion of the district judge who originally considered these habeas claims is included, two federal judges think the OCCA's assessment of the federal Constitutional issues was not objectively unreasonable and two think it was objectively unreasonable. The State of Oklahoma is left with the resulting detritus. So much for applied federalism and comity.

And where does our decision leave the State? It can accept a federal court veto of the jury's sentencing decision and settle for a life sentence. Or it can empanel a new jury, which will not have heard the guilt phase evidence, and hope to convince the new jury to ratify the trial jury's sentences. And it will have to do so at least eighteen years after the murders were committed and time has scattered witnesses, eroded memories, rusted the community's sense of outrage with this mass murder, dulled the voices of the victims' families and turned the fire in the

prosecutors' bellies to ash (because the attention of new prosecutors has been diverted to more recent atrocities and the task of resurrecting and presenting a very old case to an uniformed jury is daunting, indeed).